CHARLES ORAN MENSIK AND MARY MENSIK, PETITIONERS, *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 76517.   Filed January 16, 1962.

*Anna R. Lavin, Esq.*, and *Edward J. Calihan, Jr., Esq.*, for the petitioners.

*Don S. Harnack, Esq.*, and *Warren C. Seieroe, Esq.*, for the respondent.

706

720

724

OPINION.

TURNER, *Judge:* At the outset, the petitioner contends that because of concessions made by the respondent at the trial herein, it follows that his determination of deficiency was arbitrary and capricious and should not be accorded its usual presumption of correctness. With respect to the first of the issues stated, the respondent has made no concession, but to the contrary, now claims, by amended answer, that the amount in issue should be increased from $176,312.50, as originally determined, to $206,330.56. There is, of course, no presumption of correctness as to the additional amount now claimed, but as to $176,312.50 covered in respondent's determination of deficiency, the presumption of correctness continues. As to the issues wherein the respondent has conceded the dollar amount of the items in whole or in part, the petitioner's argument is identical to the one we rejected in

*Fada Gobins*, 18 T.C. 1159, affirmed per curiam 217 F. 2d 952, and similarly, we reject the argument here. In *Fada Gobins*, *supra* at 1168, we said:

It is the contention of counsel for the petitioner that, by reason of these concessions at or in the course of the trial, the burden of proof as to the correctness of the deficiency has shifted from the petitioner to the respondent. The contention is wholly devoid of merit. The concessions made by counsel were not only in the interest of orderly procedure, but they relieved petitioner of a substantial portion of her burden of proof and this court of what could have been an even longer and more burdensome trial. His action was in keeping with his duty as a lawyer and officer of the Court. To rule with petitioner, would be to say that counsel, whether for respondent or petitioner, who, by concession or stipulation of pertinent facts, relieves opposing counsel of a portion of his burden of proof and the Court of needless labor, does so at the jeopardy of having the burden of the opposing party as to remaining matters shift to himself. Justice and common sense would countenance no such rule.

See also *William O'Dwyer*, 28 T.C. 698, 705, affd. 266 F. 2d 575.

In his determination of deficiency, the respondent determined that petitioner had received unreported income of $327,824.04, comprised of a number of items constituting taxable income to him from City Savings Association and Melvin Building Corporation. The $327,824.04 was made up of six items, of which $176,312.50 was in the same amount as two payments made by Melvin at the instigation of petitioner as purported loans to Orville Hodge. The first of the purported loans was in the amount of $76,312.50, on March 12, 1956, on which date City Savings had paid $61,000 to Melvin, purportedly in respect of the remodeling of its building, which payment had brought the total of such payments by City Savings to Melvin to $277,500. The second purported loan was set up as two loans for $50,000 each, on June 29, 1956, 2 days after City Savings had made a payment of $43,000 to Melvin, purportedly the final payment in respect of the remodeling of its building, which payment brought the total of such payments to Melvin by City Savings to $367,800.

As the basis for increasing his claim from $176,312.50 to $206,330.56, respondent uses $124,207.26, shown by Melvin's Account 6 B as the cost to Melvin of the City Savings remodeling job, as Melvin's actual cost for the job. To that amount, he has added 10 percent for overhead and 20 percent as profit to arrive at $161,469.44 as the cost to City Savings for the remodeling work done, and at the difference between $161,469.44 and the $367,800 paid, or $206,330.56, as City Savings funds diverted through Melvin to or for the benefit of petitioner, in the guise of loans to Hodge and to petitioner.

It is the contention of petitioner that the cost to City Savings for the remodeling work done by Melvin was fixed by contract at $367,800; that $367,800 was the amount City Savings was obligated to pay and the amount it paid; that there was no payment of an excessive amount

by City Savings to Melvin which could represent City Savings funds diverted through Melvin to him or for his benefit; and that though both he and Hodge did receive payments from Melvin, they were bona fide loans, and no part thereof was or properly could be regarded as income to him.

Plans for the remodeling were prepared for City Savings by Bagnuolo, its architect, who estimated that the cost to City Savings would be $125,000. In other words, it was his estimate that a payment of $125,000 by City Savings should cover the actual cost to the contractor for the remodeling and the profit to the contractor thereon. We do not have a breakdown of the $125,000 as between cost and profit, and hence do not know how much of the $125,000 represented Bagnuolo's estimate of cost to the contractor. In any event, the amount actually paid by City Savings to Melvin was $367,800, not $125,000, and the parties are immediately at odds as to the scope of the work actually done and the cost to Melvin therefor. In justification of the $367,800 payment, petitioner, when on the witness stand, went so far as to testify that Bagnuolo's plans were simply for a room layout and elevator installation, and "had nothing to do with 98% of the work that was done." This statement, in our opinion, was so gross in exaggeration that it requires no comment. There were, however, some costs in the completed work which had not been estimated for by Bagnuolo but which were covered by Bagnuolo in his testimony. Petitioner, in his own behalf, described numerous other items not covered by Bagnuolo in his plans as having been included in the work done, and to the extent that they were in fact covered by the work done they too could supply a proper basis for a payment by City Savings to Melvin over and above the $125,000 estimated by Bagnuolo.

One item contemplated from the beginning, but not included in the $125,000 estimate, involved partitions on the second floor to create three offices to be used for closing contracts. Petitioner was not fully satisfied with Bagnuolo's suggestions, and it was agreed that the partitions would be omitted from the original plans and worked out later. In addition, some problems which had not been anticipated arose as the work progressed. To solve some structural difficulties which were encountered, six or seven steel beams were designed by Bagnuolo and installed and supporting members of the roof structure were strengthened. It also became necessary in connection with the installation of the elevator to undermine certain existing walls and to provide shoring and additional footings. Bagnuolo worked out solutions to these problems as they arose. A further variation from the original plans was a change in the elevator doors.

Petitioner rests his claim of $367,800 as the actual and bona fide cost to City Savings for the remodeling job on two purported contracts

between City Savings and Melvin. The first such document bears date of September 10, 1955, and called for a payment of $321,000. The second such document bears date of January 20, 1955, and called for a payment of $46,800. It was petitioner's testimony that the second document was executed on the day and month indicated but in 1956, and not in 1955.

The document bearing date of September 10, 1955, called for the remodeling of the City Savings building "as per architect plans plus all items listed on the second page of this contract." The "plus" items, 19 in number, were listed on two additional sheets and included some items which had been covered by Bagnuolo in his plans and estimate and some which had not been so covered. Partitions, except as above noted, plumbing, electrical wiring, and fixtures on the second floor had been covered, except that the fixtures used by Bagnuolo in his estimates were less expensive than $75 per fixture, which was specified as the maximum price per fixture in the so-called "plus" item. There is, however, no proof as to the cost of the fixtures used, and beyond the broad assertions in Mensik's testimony, no indication that the actual cost was greater than Bagnuolo had estimated. Other so-called "plus" items which had been covered by Bagnuolo in his plans were five washrooms, new counters, a new rear door, replacement of a front door with a window, a stairway to the roof, a vault,[15] a washroom on the first floor, and the elevator. The elevator actually installed was an Otis elevator which was of competitive price with the indicated Westinghouse but with doors which resulted in added cost. Not covered by Bagnuolo in his plans but included as "plus" items in the document, were air conditioning for the second floor; "heating, piping radiators to all rooms" on the second floor; rubber tiling for all rooms, and a "cement sponge" base therefor; the steel beams later designed by Bagnuolo and installed, as above described; a flowerbed on the front of the building; tuck pointing of walls "where needed," and installation of iron guards "in front of windows and closing room on second floor"; painting and papering the walls on the second floor; Celotex ceilings for the second floor; provision for laborers, at the disposal of City Savings, for cleaning up the debris and to move desks, furniture, etc.; and provision for having the work done overtime and on Sundays "when requested."

The document bearing date of January 20, 1955, had to do with the first floor of the City Savings building, and provided for a new terrazzo floor; new light fixtures, with a maximum price of $75 per fixture;

---

[15] It was petitioner's testimony that the vault was covered by Bagnuolo's plans. As set out in the "plus" items, the vault was to be "fire-proof and burglar proof," with the walls, floor, and ceiling to be reinforced "with concrete one-inch rods." It was Bagnuolo's testimony that as covered by his plans the vault was to be constructed of cement blocks, with a "two hour fire door."

three coats of paint or wallpaper not to exceed $20 per roll; a washroom and counter adjoining a private office; waxing and polishing; and the remodeling and enamelizing of Celotex ceiling. There was also a provision that the "general remodeling of the first floor" be done on an overtime basis so that the conduct of business would not be hampered.

With respect to the first floor, Bagnuolo's plans and estimate covered a washroom on the first floor adjacent to the elevator and the first floor work which was related to the elevator and its installation. They did not otherwise include the items listed above from the second document.

Whether the so-called "plus" items, or any appreciable portion of them, which were not covered by Bagnuolo's plans or worked out by him as the work progressed were in fact included in the work done by Melvin, we are satisfied that the work was not done pursuant to or under the written documents bearing dates of September 10, 1955, and January 20, 1955, and calling for payment of $367,800 by City Savings to Melvin. At December 31, 1955, the payments by City Savings to Melvin had amounted in the aggregate to $122,000, and the expenditures by Melvin on the remodeling work to $44,969.50. On January 17, 1956, Winterhalter, Melvin's accountant, discussed the remodeling job with petitioner and Melberg, in preparation for the filing of Melvin's 1955 income tax return. He was instructed that no part of the payments was to be taken into income for 1955, but when the remodeling was completed in 1956, Melvin was to take up a profit of "approximately" 20 percent, after allowing 10 percent for overhead. At or about the time of this discussion, Winterhalter noted on his work papers that these instructions were "Per C. O. Mensik." There was no mention to Winterhalter at that time, or at any other time, of the existence of any written contract or contracts covering the City Savings remodeling job for $367,800, or any other amount. As to the conversation with Winterhalter and the giving of such instructions to him, petitioner in his testimony was equivocal and evasive. The testimony of Winterhalter, on the other hand, was definite and convincing, and we are satisfied his testimony reflects what actually happened. There is no possible way of reconciling this conversation and the instructions given with the existence of a contract or contracts calling for the payment of $367,800 or any other fixed amount or amounts for the work to be done.[16] In that connection, it is doubtful that the need for the steel beams at the second floor and the strengthening of the

---

[16] According to the evidence, Melvin, at some time in 1954 to 1956, was employed by Mensik to do a remodeling job on a piece of property owned by him personally and, as in the case of the City Savings job, he instructed Winterhalter that Melvin was to receive its cost, plus 10 percent for overhead and 20 percent for profit. Melvin's accounts show, however, that upon payment by petitioner of the amount representing Melvin's cost, the account was satisfied.

roof structure included as one of the so-called "plus" items in the document bearing the date of September 10, 1955, was even known at September 10 so that it could have been included in a contract on that date. The remodeling did not commence until some undisclosed date in September and the structural difficulties did not come to light until after the work was underway. It was only then that solution of the problem through the use of steel beams was worked out by Bagnuolo.

As to Melvin's actual cost on the remodeling job, the record leaves much to be desired. As above indicated, it is respondent's position that Melvin's cost did not exceed $124,207.26, the amount shown therefor in its Account 6 B, plus 10 percent for overhead, and, after allowing 20 percent additional as profit, the excess of the payments by City Savings to Melvin was to or for the benefit of petitioner. In contrast, it is the position of the petitioner that the obligation of City Savings for the work done was $367,800, as fixed by the two purported contracts; that the cost to Melvin was $256,207.26, leaving to Melvin as its profit $111,592.74, which even if true would be the rather remarkable profit to Melvin of 43.5 percent of its cost, amazing in fact when Mensik's position of trust with City Savings is considered.

To arrive at $256,207.26, Winterhalter, when he was preparing data for Melvin's 1956 income tax return and under instructions from petitioner and Melberg, transferred to the 6 B account $60,000 of a total of $106,029.68 shown by Melvin's books as its total administrative and overhead expenses for 1956, $50,000 of a total of $52,800 shown by Melvin's books as unallocated inventory as of December 31, 1956, and entered $22,000 in the 6 B account as added engineering costs to Melvin for the remodeling job. These items when added to the $124,207.26 shown by the 6 B account as Melvin's cost for the City Savings job brought the total to the $256,207.26 as claimed.

As for the $22,000 charged as engineering costs, the record is definite and clear that the entry was entirely fictitious and that Melvin made no such expenditure.

With respect to the $60,000 transferred from the account covering administrative and overhead expenses, the facts show that the total of such expenditures for 1956 with respect to Melvin's entire operations amounted to only $106,029.68. The facts further show that Melvin's gross receipts for 1956 from all of its operations amounted to $2,235,145.93, of which the $367,800 received from City Savings was approximately 16½ percent. Melberg in his testimony gave some indication that he regarded $24,000 of the $60,000 so transferred as having to do with miscellaneous labor and the use of trucks and equipment, and only $36,000 as representing administrative and overhead expenses. Melvin charged most of its labor expenses directly

from the timecards of its workmen to the particular job or jobs on which they were working. This was not feasible, however, in the case of some of its personnel, such as truckdrivers and maintenance men, who were not assigned to a particular job. The cost of their services was carried in Melvin's accounts under the heading "Miscellaneous Labor." The amount reflected by Melvin's records as having been spent for miscellaneous labor in 1956 is not shown. But the best recollection of any of the witnesses, other than Melberg, was that the total amount for miscellaneous labor for Melvin's entire 1956 operations was around $30,000. Furthermore, we are not persuaded by any proof of record that any substantial portion of the work done on the City Savings job was by unassigned personnel, such as truckdrivers and maintenance men, or that any substantial percentage of the total shown by the miscellaneous labor account was attributable to the City Savings job.

As for the $50,000 transferred from the inventory account as of December 31, 1956, the only items described by Melberg in his testimony were rough lumber, cement, and some brick, and with respect to brick, it was admitted that comparatively little brick was used for the job. Obviously, cement was required, but whether or not the reference to cement included materials used by the plasterers does not appear. We are accordingly unable to conclude that any justification was shown for the allocation to the City Savings job of any very substantial portion of the $50,000 which was so allocated.

Bagnuolo did not testify as to the portion of the $125,000 estimated by him as the cost to City Savings for the remodeling of its building which was to represent cost to the contractor and the portion which was to represent the contractor's profit, but, assuming a profit of 20 percent, which was the percentage of profit petitioner informed Winterhalter was to be allowed to Melvin as its profit, Melvin's cost, exclusive of the partitions for the closing rooms and other added or "plus" items, would have been, according to Bagnuolo's estimate, somewhere in the neighborhood of $104,000 to $106,000. As already shown, Bagnuolo testified to certain added or "plus" items which had not been covered by him in his estimates. It was the testimony of petitioner that numerous other items were included in the work done which were outside of Bagnuolo's plans. As to the extent to which that was true, we have no satisfactory evidence. We are satisfied, however, that for the most part the work done was covered by Bagnuolo's plans. It was his testimony that his responsibility as the architect was to see that the building was constructed safely and soundly and he saw that that was done; that due to structural problems which arose as the remodeling work progressed, he was called in on many occasions and although he did not follow through on the finishing, plastering, etc., he did see that

the remodeling work as carried out was substantially in accordance with his plans.

However, that may be, Melvin's Account 6 B was set up to cover Melvin's cost on the remodeling job and the cost of the items relating to that job were supposed to have been covered therein, and we are satisfied that for the most part they were so covered, and not only the items estimated for but the "plus" items as well. The cost to Melvin as shown by that account, after the elimination of $8,809.55 paid to Robert Johnstone with respect to work other than the City Savings job, was in the total amount of $115,397.71. From the testimony of Winterhalter, and even that of Mary Ann Barto, it would appear that all expenditures by Melvin shown by invoices, memoranda, and records to have been made in respect to the City Savings job were entered in the 6 B account. And, it is reasonable to conclude, we think, that any and all of the additional or "plus" items which related specifically to the City Savings job and were not such materials as would normally be included in general inventory were in fact so charged to the 6 B account. Among such items would be the added cost of approximately $10,000 for the steel beams specifically designed by Bagnuolo for the City Savings job and the additional $5,250 resulting from a change in the elevator doors. In our opinion, it would not be reasonable to conclude that any such items would ever be charged to the unallocated inventory account rather than to the 6 B account. The same would be true, we think, for air conditioning for the second floor, counters, glass and aluminum, special doors such as were described by petitioner, and other items which were specifically procured for the City Savings job. As for most such items, we have only the testimony of petitioner, which, as already noted, we do not regard as being wholly reliable. There is supporting testimony which tends to show that the second floor does have air conditioning, and it was petitioner's "recollection" that its cost was around $9,600. On the other hand, it is possible that the brick and cement and the rough lumber needed for the work relating to the shoring of the walls and the footings therefor in connection with the installation of the elevator and for the strengthening of the members of the roof structure, not having been anticipated or requiring specific design, could have been hauled from other locations and could have come from unallocated inventories. The same might have been true of the lumber required for the framework of the partitions for the closing rooms, and it is also possible that to some extent lumber, brick, and cement from unallocated inventory could have been used otherwise on the job.

We are fully satisfied and convinced, however, that the added costs over and above the costs shown in the 6 B account were far less than the amounts thereafter added by Winterhalter as costs under the direc-

tion of petitioner and Melberg. . In short, we are satisfied and convinced that there was a gross overpayment by City Savings to Melvin for the remodeling job done on its building and that such overpayment was advisedly arranged by petitioner, and we have so found as a fact. We are further of the opinion and conclude that petitioner has failed to prove that the amount of such overpayment was in any lesser amount than $176,312.50, covered by the respondent in his determination of deficiency herein.

The petitioner called as witnesses two appraisers to give restrospective opinions as to the cost of the remodeling work done on the City Savings building. One of these witnesses had made his retrospective examination of the building on the day before he was called to testify in this case. He arrived at a figure of $253,000, plus the cost of the elevator, for the work done. As the basis for his estimate, and in determining the work which was done in the remodeling, he used Bagnuolo's plans, and working from those plans made his estimates from what he could discern and from what he could "see with his eyes." The only departure from Bagnuolo's plans noted by him had to do with two closing rooms which he saw upon his inspection of the building but which were not on Bagnuolo's plans. He did not make allowance for some of the added items, such as the steel beams at the second floor which he did not see, but did make allowance for labor overtime. The amount arrived at by him was not only his estimate of the cost to the contractor for the materials and work done, but also included an allowance for overhead and an allowance to cover the profit to the contractor. His allowance for overhead was 10 percent. As a proper profit for the contractor, his allowance was 10 percent, as compared with the 20 percent indicated by petitioner to Winterhalter and the 43.5 percent indicated as the profit actually realized by Melvin, if the claimed cost of $256,207.26 to Melvin for the work be accepted.

The other witness had made two appraisals of the City Savings property, one possibly a year prior to the remodeling and the other as of November 5, 1956, after completion of the work in the preceding spring. It was his recollection that in his first appraisal he had attributed approximately $350,000 to the building. In his 1956 appraisal, he arrived at a figure of $553,049, which was $203,049 greater than the figure attributed to the building prior to the remodeling work. It is to be noted, however, that the $553,049 was his estimate of the reproduction cost for the entire building as of November 5, 1956, and some portion thereof would represent the increase in building costs on the building proper, which had been appraised at approximately $350,000 something more than a year before, and another portion would represent the increase in the costs of the remodeling,

both of the appraiser-witnesses having testified that building costs had increased substantially. Further, it is reasonable to conclude, we think, that the $553,049 estimate of reproduction cost for the whole building included the amount regarded as the proper profit to the contractor, as was true of the estimate of the other witness and that of Bagnuolo. Based on such an estimate, it would follow that the actual cost of the remodeling, including a proper profit to the contractor for the work done, would in reason be somewhat less than the $203,049 margin of the November 5, 1956, estimate of $553,049 over the prior estimate of $350,000.

It thus appears that the testimony of these witnesses supports the conclusion we have reached above that the $367,800 payment by City Savings to Melvin for the remodeling job done on its building resulted in a gross overpayment.

Even so, it is the contention of petitioner that there was no diversion to him or for his benefit of any of the amounts paid by City Savings to Melvin. For support for his position, he relies primarily on his own testimony. As to his testimony that there was no overpayment by City Savings to Melvin in respect of the remodeling of the City Savings building, we have already stated our views and conclusions. Be that as it may, it was petitioner's further testimony that though both he and Hodge did receive payments from Melvin in the taxable year, these payments were bona fide loans by Melvin to them, not the diversion of any of the amounts paid by City Savings to Melvin, and did not effect the receipt of "one penny" of income by him. As supporting this testimony, he relies on the notes, or purported notes, in favor of Melvin, showing him and Hodge as the makers thereof. There was no showing or offer to show how the payments admittedly received by him were treated on his personal accounts and records. In that connection, it is to be noted that it was his testimony that he had many transactions of which he made no record.

However that may be, the events which actually transpired between petitioner, Melvin, and Hodge, as they relate to the funds in question, were peculiarly within the knowledge of petitioner. And with respect to Hodge, they were, so far as appears, solely between petitioner and Hodge and no one else, and we are not in doubt that he has not seen fit to relate the full story or a story which was wholly true. There are critical parts of his testimony, some of which has already been noted, which are at variance with other evidence of record, and it is not possible to tell just where the truth ends and fiction begins.

With respect to his relations with Melvin, it is petitioner's contention that he had no proprietary interest in and no control over Melvin; that his interest in Melvin was that which he as president of

City Savings would normally have in a borrower from City Savings and as the personal friend of those who did own Melvin, and that any participation in the affairs of Melvin or in discussions with respect to its operations, was at the request of those who owned Melvin.

Obviously, petitioner was not nearly so objective and impersonal in his management of City Savings and in his relations to Melvin as he contends. The facts are quite definite that though serving City Savings in a position of trust, petitioner in his conduct of its affairs consistently had an eye for personal gain even at the expense of City Savings, and sufficiently so to impel the Cook County Circuit Court to find that the rentals paid by petitioner for the space occupied by petitioner's various personal enterprises were inadequate, and in its order returning City Savings to petitioner's management and control as its president and managing officer, to direct that a fair and proper rental be paid; to find and declare that "C. Oran Mensik cannot enter into any business transaction wherein all of the profits do not inure to the benefit of City Savings Association, where City Savings Association is a party on the one hand, and C. Oran Mensik, or a corporation or proprietorship owned or controlled directly or indirectly by him, is the party on the other hand"; and to further find and declare that Mensik might not retain any substantial ownership and control in any other savings and loan association in the State of Illinois while he is president and executive managing officer of City Savings, and order that he divest himself of all management and control of First Guarantee and Chicago Guarantee, and cease forthwith to serve as an officer or director of either so long as he should remain the president and chief managing officer of City Savings. It further appeared that petitioner permitted Pikiel, who as attorney for City Savings was also in a position of trust, to, so to speak, work both sides of the street, thereby causing the court in its order to permanently enjoin Pikiel from serving City Savings and any of its borrowers in the same transaction, and from serving City Savings while at the same time serving any other person in any transaction with City Savings. It also ordered that Pikiel, if he occupied space in the offices of City Savings, should pay a fair rental therefor and that as with respect to petitioner the master should take proof and report his findings, conclusions, and recommendations as to the fair and reasonable rental to be paid.

As between petitioner and Melvin, the record shows that Mensik was likewise in a position of dominance, and where his personal interests were concerned, that he did dominate. He put his brother-in-law, Kramer, into Melvin as a purported substantial stockholder and then took him out to bring him to City Savings as a vice president and director, and with petitioner, to become a majority of City Savings'

executive committee. Petitioner's father had been one of the founders of Melvin in 1945, and major stockholder. In 1951, Kramer purported to buy his stock, under a contract which provided that Kramer was to give a judgment note in the amount of the sales price but that in the event of default the stock was to be taken in complete satisfaction, without Kramer being personally liable therefor. Actually, however, petitioner paid his father in full for the stock, and Kramer gave a judgment note to petitioner in the same amount, with petitioner holding the stock as "collateral." Thereafter, when Kramer purported to acquire further shares of Melvin stock, the transaction, in practical effect, was the same. Kramer never actually paid any money on the note or notes, or the stock, which at all times was held by petitioner, and there is no indication that it was ever intended that he should. When Kramer moved from Melvin to City Savings, the Melvin stock was transferred from Kramer to petitioner's sister, who likewise executed a judgment note in favor of petitioner, which took the place of Kramer's note. Up to the time of the trial herein, she had never actually participated in any of Melvin's affairs, and had made no payments to petitioner on the note. In contrast with Kramer, however, the stock was delivered to her and she had not been required by petitioner to deposit collateral and she had paid some interest. Mary Ann Barto was a stockholder and secretary of Melvin. She was first employed by petitioner in 1942, as a stenographer-secretary in a newspaper publishing enterprise of which petitioner and Melberg were copublishers. She continued to serve petitioner in various ways, including the acting as nominee in many of his personal transactions, and when First Guarantee, of which petitioner owned 98.8 percent of its stock, was organized, she served as its secretary for approximately 1 year. In addition, she sought and received petitioner's advice in her own purchases of property. Furthermore, there is evidence of record tending to show that simultaneously with her employment with Melvin she was likewise an employee of petitioner in his operations as Allied Investment Company. See hereafter the quoted portion of petitioner's testimony before the master in the Cook County Circuit Court case. In short, the evidence is such that we have found as a fact that in transactions of petitioner with which Kramer, Mary Ann Barto, or Carl Melberg were concerned, they were subservient to petitioner.

Petitioner sat in on conferences covering Melvin's accounting procedures and those relating to the reporting of its income. In various of the transactions where he was involved, directly or indirectly, Melvin and certain of its personnel acted pursuant to his directions. And even though Carl Melberg was present at some if not all of the conferences, Melvin's accountant took pains in numerous instances to note that the action taken was "Per C. O. Mensik."

Through loans from City Savings, Mensik saw to it that Melvin received adequate financing for its construction operations, and Melvin, in turn, provided Mensik with a readymade market for real estate, as well as the source of substantial sums of money as he desired.

Whether Melvin might have had some difficulty in financing its operations elsewhere, we do not know. But there is some indication from petitioner's letter of March 2, 1956, to Melvin, that there was some sentiment, if not restrictions, against the making of construction loans by savings and loan associations. In any event, from the time Melvin was organized, petitioner had seen that it had had construction money from City Savings. It is to be noted further that the Cook County Circuit Court, in its order, directed that City Savings require all multiple borrowers "to further collateralize all present loans to the extent of six per centum (6%) of their present unpaid balances before being granted any further loans," and we do know that Melvin was one of two to four multiple borrowers from City Savings.

As to the loans by City Savings to Melvin, it was Mensik's testimony that such business with Melvin had proven to be very profitable to City Savings and in the last 10 years City Savings' earnings in commissions and interest on that business had been well over a half million dollars. There is no suggestion or claim that City Savings had not found its loans to Melvin profitable, and we have no reason to conclude otherwise.

As for Mensik personally, he too found business with Melvin most profitable, and in the years 1953, 1955, and 1956, he realized gains on sales of real estate to Melvin in the amount of $596,459.54, and the properties involved were in the main, if not wholly, properties in the development of which Melvin expected to obtain and did obtain its financing from City Savings. In one sale alone, made in June or July of 1955, petitioner's profit was $422,000, on a property on which Melvin and another started development work within 2 to 3 months of its purchase by Mensik, even though the formalities of sale and conveyance to Melvin were not concluded until 8 to 10 months after its purchase by petitioner. This particular property was a 103-acre farm, which at or about the time of acquisition by petitioner was appraised at $300,000 by petitioner's employee Emerson. Petitioner acquired the farm in exchange for four apartment buildings, each of which was under mortgage to City Savings. Petitioner was buying two of the apartments from Melvin on contract, and he may never have had title to them. After its acquisition by petitioner, the farm was mortgaged as security for three loans, likewise from City Savings, the proceeds of which were used to satisfy the mortgages on the four apartment buildings, in exchange for which the farm had been acquired. In December of 1954, there were two additional loans from City Savings

on the farm, each for $132,000. The substantial balance of mortgage proceeds remaining after the mortgages on the four apartments were satisfied were retained by petitioner. It is thus apparent that in substantial part, if not wholly, the source of the funds with which Melvin purchased the farm at such a remarkable profit to petitioner was City Savings.

According to the corporate minutes, Melvin's board of directors, at a meeting on February 14, 1956, adopted a resolution to the effect that in order to further the business of Melvin, surplus funds could be advanced as loans to Melvin's employees, officers, clients, or other persons who generally would promote its business. There is nothing of record to indicate that Melvin on that date, or prior thereto, had ever had funds in any substantial amount which were not needed or required in its operations and which would be available for the making of such loans. To the contrary, its income tax returns for the years 1952, 1953, 1954, and 1955 indicate that its operations for those years had resulted in a net loss of $20,118.30. Its balance sheet appearing in its 1956 return does indicate that it had $91,163.60 in cash on hand at January 1, 1956, but it also shows that instead of earned surplus or undivided profits, there was an existing deficit of $47,762.64. At February 14, the City Savings remodeling job was within some 3 weeks of completion, and if $367,800 was, bona fide, the price City Savings was to pay therefor, a very nice profit on that job was in the offing, and might thus supply some funds for the loans so authorized. And according to Melvin's books as finally set up a profit of $111,592.74, being 43.5 percent of Melvin's cost, was realized. Whether in the circumstances such a profit would be unconscionable, we need not decide. The fact is, however, that as late as January 17 preceding, petitioner had advised Winterhalter that the profit to Melvin on the City Savings remodeling job was to be cost, plus 20 percent, after allowing 10 percent for overhead, and there was no mention of any contract or contracts calling for a payment of $367,800 by City Savings to Melvin. On February 14 the payments by City Savings to Melvin on the remodeling had amounted to $157,000.

Under date of March 2, 1956, some 17 days after the date of the February resolution, Melvin received a letter from petitioner, recommending a loan to Orville Hodge. He pointed out that Hodge was "very enthusiastic about construction lending for savings and loan associations, which is what we are interested in," and that with Hodge in office savings and loan associations in general would be able to make all the construction loans they desired. He further stated that he was making a $200,000 mortgage loan in May following on the Esquire Apartment Hotel represented as belonging to Hodge and that the loan recommended by him for Hodge would be paid back from the

proceeds of the $200,000 loan on the Esquire Apartment Hotel. In the interim between February 14 and March 2, an additional $15,000 had been paid by City Savings to Melvin and credited on Melvin's books as a payment on the remodeling of the City Savings building, which brought the total payments by City Savings to $172,000. On March 9, 7 days after the date of Mensik's letter, City Savings made a further payment of $45,000, which was similarly so credited. On March 12, 1956, City Savings paid an additional $61,000 to Melvin, and on the same date, namely March 12, Melvin issued a check for $76,312.50, payable to the order of Orville Hodge, and, according to Mary Ann Barto, at or about that date received an unsecured judgment note in the same amount, payable 90 days after date, without interest, and indicating that Hodge was the maker. On May 11, 1956, a $200,000 loan was made by City Savings, secured by a mortgage on the Esquire Apartment Hotel but no payment was made on the $76,312.50 from the mortgage funds or any other funds, and no payments have been made thereon by anyone since that time.

On May 28, 1956, a payment of $46,800 was made by City Savings to Melvin and credited by Melvin to its 6 B account as a payment on the City Savings remodeling job. On June 27, 1956, a payment of $43,000 was made and similarly credited by Melvin to its 6 B account, which payment brought the total payments by City Savings to Melvin to $367,800. Two days later, on June 29, 1956, and some 49 days after the loan of $200,000 by City Savings on the Esquire Apartment Hotel and when the March 12 note, or purported note, was in default, Melvin issued two checks for $50,000 each for the purported purpose of making a further loan of $100,000 to Hodge. No one from Melvin made any contact with Hodge in respect of the issuance or delivery of the check for $76,312.50 or the two checks for $50,000 each issued on June 29, 1956. According to petitioner, the money in each instance was delivered by him to Hodge in his office, and if anyone else was present, the record does not so show. One of the $50,000 checks was drawn payable to cash and the other to City Savings, and when cashed showed no endorsement by Hodge, or by anyone for him. The check drawn to cash was cashed by Mary Ann Barto and the $50,000 in currency received was delivered by her to petitioner. Just how the $50,000 covered by the check drawn in favor of City Savings was handled is not shown. The facts indicate that it was deposited in the City Savings bank account. We have only the testimony of petitioner as to what transpired between him and Hodge. When asked as to the manner in which the check to City Savings was handled, petitioner's explanation was a qualified answer that if it was deposited at City Savings, "then the man wanted a cashier's check to take away with him." As in the case of the $76,312.50, it was the testimony of Mary Ann

Barto that at or about June 29, 1956, she received for Melvin two judgment notes for $50,000 each, showing Hodge as the maker. On some date not shown, but likewise in June of 1956, petitioner, according to his testimony, received $50,000 from Hodge. Whether there was any coincidence of the date of such receipt with the receipt of the $50,000 in currency from Mary Ann Barto, petitioner did not state, but he did testify that the $50,000 from Hodge was in repayment of a loan he personally had made to Hodge the year before and that receipt of the repayment had nothing to do with the $100,000 "loaned" to Hodge by Melvin.

The story does not end there, however. On or about July 15, 1956, some 16 days after the delivery, or purported delivery, of the $100,000 to Hodge by petitioner as a loan from Melvin, Hodge was faced with charges that he had embezzled funds from the State of Illinois. He resigned from his office as State auditor and was thereafter sent to prison. On July 17, 2 days after Hodge was charged with embezzlement, petitioner received a check for $200,000 from Melvin and 2 days after that used the proceeds of the check to purchase the mortgage on the Esquire Apartment Hotel from City Savings. At the trial in this case, it was the testimony of petitioner that the $200,000 was received by him as a loan from Melvin and that currently he executed a judgment note, payable in 5 years, to Melvin in that amount. The note, or purported note, carries a typewritten statement on its back, to the effect that it is expressly understood that in event of default, "the 38% interest in stock in the Chicago Guarantee Savings Association shall be held as full satisfaction for $135,000.00 of the principal amount of this note, and that the signer will not be liable for any deficiencies or losses if they should occur up to $135,000.00." At first, it was petitioner's testimony that he had posted the Chicago Guarantee stock with Melvin as security at or about the time of making the note. Later, during the trial and after being questioned as to whether or not the stock of Chicago Guarantee had not been in possession of a Chicago bank as collateral on another obligation until sometime in August of 1957, petitioner changed his testimony, to say that the Chicago Guarantee stock was not posted with Melvin until August of 1957 and the endorsement on the note with respect thereto was not made until that time.

In the proceeding in the Cook County Circuit Court, petitioner, on July 2, 1957, before a master, testified that the $200,000 received by him from Melvin on July 17, 1956, had been received in repayment of a loan he personally had made to Melvin some 30 to 60 days prior to July 17, 1956. In this case, it is his testimony that his testimony on July 2, 1957, before the master, was given through a mistaken understanding of the questions asked, and it was his thought that he

was testifying to the receipt of the proceeds of a loan from Melvin to him.

We listened to the petitioner in the course of his testimony in this case and we have carefully examined the transcript of his testimony before the master. We are fully satisfied and convinced that he did not testify before the master through a misunderstanding of the purported questions, but that he well understood the questions asked and that the answers given by him were advisedly given. At the outset of the questioning before the master, there were one or two questions which, if lifted from context and standing alone, might be susceptible of the interpretation petitioner now seeks to place upon them. The questions as a whole remove all possible doubt as to the tenor and purport of the questions, petitioner's understanding of them, and his answers thereto. Following are the questions and answers referred to:

Q. And Allied Investment Company just decided that they would pick up the loan, is that correct?

A. I thought it would be best to do so.

Q. And you picked the loan up with a Melvin Building Corporation check in the amount of $200,000, dated July 17, 1957 [sic], didn't you?

A. Yes.

Q. Melvin owed you $200,000, right?

A. That's right.

THE MASTER: When you say "you", you mean him, personally?

MR. SEARS: I am talking about him.

THE MASTER: Him, personally?

MR. SEARS: Yes. Q. You picked up the mortgage, the Allied Investment Company, and Melvin Building Corporation check paid for it?

A. It was a check they gave me for money due me from Melvin Building Corporation on a loan.

Q. You just loaned them $200,000?

A. I have loaned builders many times that.

Q. Did you loan Melvin $200,000?

A. Yes.

Q. Did you have any security for it?

A. A judgment note.

Q. Just a judgment note. Now, let's see. Mary Ann Barto is with the Melvin Realty Company too, isn't she?

A. Yes, she is with both companies.

Q. Did you give the Melvin Building Corporation back its judgment note for $200,000?

A. Yes, after it was paid.

\*       \*       \*       \*       \*       \*       \*

Q. When did you make the loan to the Melvin Building Co.?

A. I would have to check the records.

Q. Would you have any idea how old the loan was before they paid it off?

A. It could have been thirty days; it could have been sixty days.

Q. Could it have been any longer than that?

A. No, I don't think so.

On or about February 1, 1957, petitioner sold the Esquire Apartment Hotel mortgage back to City Savings for $188,000. Whether $188,000 represented the face amount of the loan, less payments on principal in the interim, does not appear. In any event, petitioner, according to his own testimony, did not apply the $188,000, or any part thereof, in repayment to Melvin of the $200,000 which had been received by him from Melvin on July 17, 1956, and used in the purchase of the mortgage from City Savings.

As indicating that the $200,000 was received by him as a loan and that he bona fide had given his note therefor, petitioner relies on certain endorsements appearing on the back of the document, the first of which would indicate the receipt by Melvin of $8,000 as interest on February 19, 1957, and would be representative of interest for the entire year ending July 17, 1957, at 4 percent, the rate shown. Following is the statement "Balance as of Dec. 31, 1957—137,250.00." There is, however, no endorsement showing payment of $62,750, the difference between the principal amount of $200,000 and the stated balance or that the reduction to $137,250 was the result of payment. The only evidence of a payment actually made by petitioner which could account for any part of the $62,750, necessary to reduce the $200,000 face amount to a balance of $137,250 at December 31, 1957, was the $10,000 payment made to Melvin by the check drawn on petitioner's Allied Investment Company account under date of March 11, 1957. It is petitioner's testimony and contention, however, that the March 11, 1957, payment was in repayment of the $10,000 received by him on May 26, 1956, for the purchase on behalf of Melvin of lot 1 of the 5000 block of West Jackson Boulevard, and that its entry on Melvin's books as a payment by him on Melvin's notes receivable was in error. There is an endorsement on the purported note indicating a payment of $2,500 on the principal on January 27, 1958, leaving $134,750 as the balance due. There is a further endorsement also dated January 27, 1958, indicating a payment of $5,400 as interest to December 31, 1958, and finally a typed statement indicating receipt of $5,390 on June 21, 1959, as interest for the "year 1959."

There is no provision on the purported note for payments of interest in advance, such as those indicated on the back of the document. An obligor could if he saw fit make payments of interest 5½ months, 6 months, or 11 months before the payment of such interest was required or due, but taking into account the relations between petitioner and Melvin and the pattern of the transactions he had with Melvin, advance payments of interest as indicated are, to say the least, in contrast with his attitude toward repayment of certain other amounts received from Melvin and purportedly owed by him to Melvin. To illustrate, it was not until February 6, 1956, that he, according to his testimony,

repaid the $90,000 received on September 12, 1955, and the $10,000 theretofore received, for the purchase of property for Melvin, and even then the repayment was made by the endorsement and return to Melvin of a check for $100,000 issued to petitioner by Melvin under that date, as a purported loan but which when issued was actually entered on Melvin's books as in payment for certain real estate Melvin had purchased from petitioner. At or after the end of the year the entry was changed to show the $100,000 as a loan by Melvin to petitioner. Also in contrast with the payment of interest in advance was the delay until March 11, 1957, in making purported repayment of the $10,000 received from Melvin on May 28, 1956, purportedly for the use in the purchase for Melvin of lot 1 in the 5000 block of West Jackson Boulevard.

In addition to these considerations, it is not at all clear from the purported note, itself, and the testimony of petitioner before the master in the Cook County Circuit Court that as originally drawn the date may not have been July 17, 1957, rather than July 17, 1956.

We do not know what the full and true story is with respect to the payments by Melvin to petitioner in 1956. As already stated, we are satisfied and convinced that there was a gross overpayment on the account of City Savings as to the cost of the remodeling job done on its building, and that the overpayments were advisedly arranged for and made by petitioner. Also, we are persuaded and convinced that they were made with the deliberate purpose of providing funds for the payments made to him by Melvin, whether they were intended for him or for Hodge, or whether they came to rest with him or were passed on to Hodge. What the arrangement was between petitioner and Hodge, we do not know. It could be that a payoff to Hodge for favors received or to be received by petitioner or his wholly owned loan companies was made. Whatever they were, and to the extent they did occur, we are satisfied that they were advisedly arranged for and made by petitioner, and there is no evidence of record which persuades us that there was any intention that such payments which did reach Hodge, if any, were to be repaid. Taking into account the pattern of the various money transfers, petitioner's method of doing business, his proclivity for using companies with which he occupied positions of trust for his separate and individual benefit and gain, we are satisfied that through the overpayment by City Savings to Melvin and the subsequent transfers of funds back to petitioner, he was in receipt of taxable income.

The respondent has determined that in such manner petitioner received and realized income in the amount of $176,312.50. By amended answer, he now claims that the amount was $206,330.56. As to the amount determined by the respondent in his determination

of deficiency, the burden of proving error was on the petitioner. He has not borne that burden. With respect to the additional amount claimed by the respondent, the burden was on him, and similarly, he has not carried his burden of proof as to that amount. As to the $176,312.50, the respondent is accordingly sustained.

By check dated May 28, 1956, and drawn payable to Allied Investment Company, Melvin made payment of $10,000 to petitioner. Respondent determined that by reason thereof, petitioner realized taxable income in that amount. The $10,000 so paid was entered by Melvin on its books as having been in payment for lot 1 in the 5000 block of West Jackson Boulevard.

The facts show that lot 1 was 1 of 13 lots which had been acquired by Irene Kunitz, petitioner's sister, in October of 1954. Petitioner acted for her in the transaction and supplied the $5,000 used as the downpayment. Under date of October 21, also in 1954, she entered into a contract whereby Melvin agreed to purchase the 13 lots for the sum of $80,800, of which she acknowledged receipt of $60,800. In entering the purchase on its books, Melvin omitted lot 1 and spread the purchase money between lots 2 to 13, inclusive. Under date of March 29, 1956, Melvin obtained a construction loan from City Savings for the construction of a building in the 5000 block of West Jackson Boulevard, including lot 1. Construction was started, and by May 25, 1956, Melvin had received $33,977.25 of the construction loan. At or about that time, Melvin, according to the testimony of petitioner and Melberg, discovered that its books did not show ownership of lot 1, and thereupon it made the $10,000 payment to petitioner and entered the $10,000 on its books as being in payment for lot 1.

It was petitioner's testimony that his employee Emerson discovered on checking at the recorder's office that Melvin already had title to lot 1 and he returned the $10,000 to Melvin. It was his further testimony that he pointed out to Melberg that lot 1 was covered in the purchase contract Melvin had with his sister and that it in fact had title to it, and further, that he stated, "I will have to return the $10,000 to you."

Petitioner did issue a check for $10,000 to Melvin on his Allied Investment Company account, but the check was not so issued until March 11, 1957, nearly 1 year after he had received the $10,000 from Melvin. The canceled check carries a penciled notation that it was in repayment of the $10,000 received in May of the year before. In that connection, petitioner testified that the penciled notation was put on the check after it had been cashed by Melvin and that he had made no record in his accounts of the receipt of the $10,000 in May previous. Melvin, however, upon receipt of the March 11, 1957, check, did not enter the payment as a return or refund of the May 28,

1956, payment, but gave petitioner credit for $10,000 in its notes receivable account. Carl Melberg, in the course of his testimony, was asked some questions relative to the matter. He did appear to recall a "second purchase" of lot 1 and that they later discovered that the lot already belonged to them, and the money was returned, "if I remember right." He was not familiar with the treatment of the payments on Melvin's books, and was somewhat hazy as to other details.

Frankly, considering the state of the record, we do not know what the truth is. We do know that the $10,000 was received by petitioner under date of May 28, 1956, which was the same date Melvin had received $46,800 from City Savings, which was a part of the excessive payments by City Savings to Melvin under the guise of payments for the remodeling of its building, and that the claimed repayment was not made until March 11, 1957, the better part of a year after petitioner had received the $10,000. We also know that when Melvin received the payment of $10,000 on March 11, 1957, it was not entered on its books as a return of the $10,000 paid to petitioner in May of the previous year, but was otherwise credited in favor of petitioner. Furthermore, there is no indication that Melvin was sufficiently concerned over its "lack of ownership" of lot 1 to suspend or delay its building operations until it acquired or knew it could acquire the said lot. To the contrary, there is every indication that City Savings continued to make advancements on the loan and the construction proceeded to completion not later than December, which was some months before the issuance of the March 11 check by petitioner.

It was the testimony of Mary Ann Barto that the entries in Melvin's books with respect to the payment and receipt of the $10,000 were in error, even though no steps had been made to correct them. And again, the question is, what is the truth. This is only one instance of entries made on Melvin's books covering transactions to which petitioner was a party and in respect of which the entries were said to have been made in error. Some such entries were later changed. These were not.

On the facts, and in the circumstances, the respondent's determination that the $10,000 received by petitioner in May of 1956 was income to him, is sustained, for failure of persuasive and convincing proof to the contrary.

Under date of April 17, 1956, petitioner caused a check for $6,800, showing Commercial Broadcasters as the payee, to be issued on the account of City Savings with the Chicago National Bank. As the basis for the issuance of the check, petitioner has placed in evidence a purported invoice of Commercial Broadcasters showing a charge of $6,800 against City Savings, for "Radio and TV advertising as per

contract in connection with April Primary for large vote 1956 for State of Illinois, of this amount $2800. For state candidates." This purported invoice was on the invoice form of Commercial Broadcasters. Written on the form in petitioner's handwriting appears the notation, "$100 a candidate for assembly, for those friendly to Savings and Loan Business." The check when cashed was endorsed "Commercial Broadcasters—D Eddleson." Commercial Broadcasters never did any advertising for City Savings or for Mensik. It issued no such invoice and never received the $6,800 check. The signature in the endorsement was not the signature of Dave Edelson, manager of Commercial Broadcasters, and was not authorized by him.

It was the testimony of petitioner that several days before April 1, 1956, the date shown on the bogus invoice, he was asked by Orville Hodge to contribute $6,800 for radio and television time for "legislators" who were "friendly" towards the savings and loan business, that he was called a short time later by Hodge's secretary, Ike Volz, who said that the money had been spent and was owing to Commercial Broadcasters. It was his further testimony that Volz sent a messenger to his office with what appeared to be an invoice from Commercial Broadcasters, which he "okayed" for payment, and that the $6,800 check was delivered to the messenger. Edelson, when called as a witness, testified that Hodge did arrange through Commercial Broadcasters for an advertising campaign exclusively on behalf of President Eisenhower, the cost of which amounted to $6,245.01, that Hodge paid $6,000 thereon by personal check and the balance was charged off by Commercial Broadcasters as a political contribution. In addition to his testimony that the invoice to City Savings for $6,800 was not the invoice of Commercial Broadcasters, that the endorsement on the $6,800 check was not his endorsement, and that Commercial Broadcasters did not receive the check, it was his further testimony that no radio and television advertising such as was described in the bogus invoice was carried on by Commercial Broadcasters.

We do know that petitioner caused the $6,800 check to be issued on the City Savings bank account and that the check was cashed. As to the recipient of the $6,800, we have only petitioner's testimony, which, as heretofore indicated, we do not regard as wholly credible. It was petitioner's testimony that the proceeds of the check wound up in Hodge's "brown envelope" at the Southmor Bank. The "brown envelope" he explained was a lockbox. Just how he knew this he did not say. If the check was in truth delivered to Ike Volz, Ike Volz, if called, could have so testified. Petitioner, however, called no one, and leaves this issue to rest upon his own testimony, which as hereto-

fore indicated we do not regard as reliable. For failure of credible proof, the respondent's determination as to the $6,800 is sustained.

With respect to the reporting of his gains from the sales of real estate, petitioner not only contends that his sales were not made to customers in the ordinary course of a trade or business carried on by him, but first contends that the respondent's determination was not a determination that the parcels of real estate sold were not capital assets and the gain therefrom other than capital gain, under section 1221 of the Internal Revenue Code of 1954.[17]

What the respondent actually did was to eliminate from his computation of income the amount petitioner had taken into account as taxable capital gains from his sales of real estate, and in lieu thereof, to include petitioner's total receipts on such sales, the stated reason for including such receipts in full being lack of substantiation of the cost of the property sold. Petitioner has now satisfied respondent as to the amount of such cost, and the amount of gain realized is not now in dispute. If the respondent's determination had been intended as a determination only of petitioner's failure to substantiate his cost basis, the adjustment would have been merely to increase the amount of capital gain reported on the return by that portion of the additional gain to be taken into account, rather than to eliminate it entirely and substitute therefor the full amount of the receipts as taxable income. It is accordingly evident that the respondent's determination was a determination that the gains on the real estate sales constituted ordinary income, not capital gain.

By virtue of his position as president of City Savings and his dominant position with Melvin, petitioner was able to develop, and did develop, a very profitable real estate business as an integral part of his business operations. He acquired property for his own account and sold it to Melvin, realizing very attractive profits thereon, which he reported as capital gain. The facts show that petitioner had engaged regularly in such transactions, which included, in addition to the sales to Melvin, some sales to other parties, over a period of 4 or more years prior to and including the taxable years. One of the services performed for petitioner by Emerson under his employment was to check titles of parcels of real estate for purchase by petitioner for his own account. Such purchases and sales were regularly made and were an important element in petitioner's business operations. We have found from the evidence that the property sold was held for sale to

---

[17] SEC. 1221. CAPITAL ASSET DEFINED.

For the purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

customers in the ordinary course of petitioner's business, the principal customer being Melvin. We accordingly hold for the respondent.

With respect to the income derived from petitioner's purchases of real estate tax certificates and their subsequent redemption by the land-owners, the respondent is also sustained. On the facts, *Paul K. Ashby*, 37 T.C. 92, is in point and is controlling. Also see *Kanawha Valley Bank*, 4 T.C. 252.

During 1956 petitioner, on a commission basis, sold insurance for one or more insurance companies. Among the insurance sales so made were sales to employees of City Savings, to his own employees, and to relatives and friends, on which he earned but waived commissions in the amount of $2,357.43. In reporting his income, he did not report any part of the commissions waived. The respondent in his determination of deficiency included the said commissions in income.

On brief, petitioner disavows the waiver of commissions to others than his employees and employees of City Savings, citing certain testimony that he did waive his commissions on sales to such employees. In so contending, he ignores the stipulation filed herein, wherein it is stated that petitioners agree that during 1956 City Insurance Agency "earned commissions" on insurance policies issued "to friends, relatives and employees of C. O. Mensik," which commissions, in the aggregate amount of $2,357.43, were waived and were never received or collected. From his argument on brief, it would appear that he seeks to limit the sales on which commissions were waived to employees, on the theory that in such instances the commissions, if income to anyone, would be income to the employees, and "can, in nowise, be considered as compensatory in nature to the petitioner."

As the apparent basis for this contention, he has quoted an excerpt from our opinion in *Sol Minzer*, 31 T.C. 1130, to the effect that if the sales were like a bargain purchase "where the employer intends to compensate an employee by selling property to the latter at less than fair market value (see Income Tax Regs., sec. 1.61–2 (d) (2)), we would have no hesitancy in holding that the net reduction in the cost * * * represents taxable income to him." If the purpose in quoting from the *Minzer* opinion was as stated, petitioner obviously has misread the opinion, since the statement there made does not deal with the receipt of income by an employee, but with the realization of income by the employer.

Furthermore, the *Minzer* case was not this case. There the petitioner taxpayer, who was an agent selling insurance on a commission basis, as was true of petitioner here, purchased insurance for his own account. In holding that Minzer did not realize income to the extent of commissions on the insurance purchased, we were of the opinion that he was making a purchase at wholesale, so to speak, for his own account,

and did not earn commissions on his own purchases. We distinguished the situation there from the case where the agent for the insurance company was selling insurance to third parties, and our reasoning with respect to such sales supports the position of the respondent in the instant case, rather than that of the petitioner.

In *Minzer*, we were reversed by the United States Court of Appeals for the Fifth Circuit, at 279 F. 2d 338, the court holding that commissions were earned and income was realized to the extent of the commissions on such insurance sales, even though there was no sale of insurance to third parties but a purchase of insurance by the agent for his own account. Since this case is distinguishable from *Minzer* in the respect noted above, it is unnecessary in this case for us to reconsider our holding in *Minzer*.

The extent to which the sales involved were sales to petitioner's employees is not shown, and whether or not the employees realized income to the extent of waived commissions on insurance which they did purchase, we do not decide. Their cases are not before us.

As stipulated, petitioner earned commissions, which he voluntarily waived, on insurance sales to friends, relatives, and employees. Having so earned the commissions, he may not escape taxation thereon by voluntarily waiving or assigning his right thereto to someone else be they friends, relatives, or employees. *Lucas* v. *Earl*, 281 U.S. 111, and *Helvering* v. *Horst*, 311 U.S. 112.

Under date of July 1, 1955, an instrument entitled "Contract for Insurance Commissions" was executed by Robert Kramer, as president, and M. A. Barto, as secretary, of First Guarantee Savings Association, and C. O. Mensik, as proprietor of City Insurance Agency, whereunder Mensik agreed that between July 1, 1955, and July 1, 1956, he would expend "up to $55,000.00 for advertising and promotion of the business" of First Guarantee. There was the further provision that, in return, the association should "recommend and give all the insurance business of its members and of its own" to Mensik, for a period of 5 years, with a renewal clause for an additional 5 years, if $100,000 in insurance commissions should not be earned during the first 5 years. A similar instrument, also bearing date of July 1, 1955, was signed by Robert Franz, as president of Chicago Guarantee Savings Association, and C. O. Mensik, as proprietor of City Insurance Agency. In 1955, petitioner paid $17,295.14 and in 1956, $32,076.14 for advertising on behalf of First Guarantee. On behalf of Chicago Guarantee, he similarly expended $18,374.84 in 1955, and $36,284.84 in 1956. It is the contention of petitioner that the expenditures so made constituted an ordinary and necessary business expense of his City Insurance Agency business, in that it constituted a promotion of the sources of the insurance business of the agency.

Insofar as appears, petitioner did not deduct for 1955 any part of the amounts so expended in that year. For the year 1956, in which he expended $32,076.14 for advertising on behalf of First Guarantee and $36,284.84 for advertising on behalf of Chicago Guarantee, he deducted $5,139.81 in respect of his expenditures for advertising for First Guarantee and $3,812.12 in respect of expenditures for advertising for Chicago Guarantee, or a total of $8,951.93 for the two. The amounts so deducted were not determined or arrived at because they represented the advertising expenditures for the account of Mensik's insurance business in 1956, but because they were the same in amounts as the commissions he had realized in that year on business originating with First Guarantee and on business similarly originating with Chicago Guarantee. The remainder of the amounts which had been so expended in 1955 and 1956 were to be deducted in subsequent years, which would be years in which no such expenditures were to be so made, in amounts equal to the insurance commissions petitioner should receive from sources originating with the two associations, until the total of such commissions and accordingly the deductions taken should equal the total of the expenditures made in 1955 and 1956. We are not referred by petitioner to any provision of the Internal Revenue Code which would permit the deduction of the expenditures in the manner outlined.

It is the position of the respondent that the expenditures were capital expenditures in the form of capital contributions to or for the benefit of First Guarantee and Chicago Guarantee, and that the primary purpose was to provide capital necessary for the launching of the businesses of the two associations and the building up of their goodwill and business-getting powers, to the end that petitioner's capital investment in the two associations should grow and be enhanced, it being noted that petitioner was the owner of 98.8 percent of the issued and outstanding stock of First Guarantee and 98.6 percent of the issued and outstanding stock of Chicago Guarantee.

In the circumstances, we are not impressed with any theory or representation that the payments were made in order to acquire the insurance business which would be provided by and flow from the two associations. Petitioner owned, controlled, and dominated the two associations, and the insurance business which might originate therefrom was his to take or leave as he saw fit. See and compare *Carroad* v. *Commissioner*, 172 F. 2d 381, affirming a Memorandum Opinion of this Court.

As supporting his position, petitioner cites and relies on *Cubbedge Snow*, 31 T.C. 585, and *Charles J. Dinardo*, 22 T.C. 430. Both cases are distinguishable from the instant case. In *Snow*, the taxpayer was allowed a deduction for amounts paid pursuant to an agreement to underwrite the operating deficits of a Federal savings and loan

association, in which there was no stock outstanding. In that case, we pointed out:

The crucial and controlling factor lies in determining whether the acts done and expenditures made were motivated by a purpose to protect or to promote the taxpayer's business or were made as an investment in a new enterprise. * * *

\* \* \* \* \* \* \*

* * * A Federal savings and loan association has no capital stock, and no individual, regardless of his contributions to the Association, may share in its income or surplus except as a member-shareholder in proportion to his or her deposit. Consequently, petitioners, by their guaranty and subsequent payments pursuant thereto, acquired no capital asset in the form of a disposable interest in a going concern. * * *

In the *Dinardo* case, the taxpayers were physicians who organized a nonprofit corporation which was to operate a hospital with its facilities limited to their patients, the purpose being the earning of medical fees from patients who were hospitalized there or who were referred to them because of their access to the facilities of the hospital. They agreed to pay any operating deficit of the hospital. In allowing the taxpayers to deduct amounts paid under the agreement, we stressed the fact that the payments were current expenses, and were not capital advances in the financing of a new enterprise. Unlike the corporation here, the corporation there was a nonprofit corporation.

In our opinion, the situation here was substantially different. The payments in question were in the nature of capital expenditures in financing the launching of two new enterprises of which the stock, except for less than 2 percent in each instance, was owned by petitioner and the July 1 agreements were gimmicks which were to supply the basis for offsetting deductions for commissions earned over the 5 or 10 years to follow up to the amount of the capital contributions. The respondent's determination is sustained.

In addition to the disallowance of the $8,951.93 as indicated, the respondent disallowed the further deduction of $169, claimed as advertising expenses of City Insurance Agency. The parties have stipulated that the said $169 was expended on advertising for City Insurance Agency, and we do not now understand that the respondent opposes its deduction. The deduction in that amount is accordingly allowed.

On June 9, 1955, at or about the date Chicago Guarantee was organized petitioner made a payment of $9,000 to Medic Building as rent for 20 months, to commence July 1, for premises to be occupied by Chicago Guarantee. During 1955 he was reimbursed by Chicago Guarantee for $2,000 of the amount so paid. In his 1955 return, he deducted as rent paid $2,700 of the $7,000 net balance, and in his 1956 return, the remaining $4,300 as rent on the premises for 1956.

In justification of the 1956 deduction, it is the contention of peti-

tioner that but for services rendered to or for him in the operation of his insurance agency by Chicago Guarantee employees and employees of First Guarantee and City Savings, he would have had to hire a clerk at a cost of $5,000 per year to look after his insurance sales originating with those associations.

While we are satisfied that petitioner did in various of his personal business operations conduct them at the expense of Chicago Guarantee and First Guarantee, as he did with City Savings, there is no evidence as to the extent or value of the services by the employees of Chicago Guarantee in respect of the business received from that source, or how it would compare or what the comparison would be in amount with the $7,000 balance expended by him as rent on behalf of Chicago Guarantee for the first 20 months of its operations. But whatever the comparison might be, we are persuaded by the evidence overall that, as in the case of the cost of the advertising of the two associations, considered above, the payment here was likewise capital in character. No part of the rent was paid in 1956, the year for which the deduction is claimed. In fact, the entire payment was made in June of 1955, the same month in which petitioner organized the association, of which he was the owner of 98.6 percent of its stock. We conclude and hold that the payment was a capital contribution by petitioner in the launching of the association, the stock of which was owned by him, and that it was not a deductible expense.

The facts show that on September 27, 1956, petitioner received premium refunds in the aggregate amount of $6,166.42 from the insurer of First Guarantee and Chicago Guarantee under fire insurance policies purchased by them through petitioner. As the basis for the refunds, the insurance company reported that a subsequent inspection of the buildings insured showed the structures to be fireproof, thereby entitling the associations to lower premium rates. Petitioner deposited the $6,166.42 in his City Insurance Agency account at Manufacturers National Bank. No part of the amount so received had been repaid by petitioner to First Guarantee or Chicago Guarantee as of the date of the trial of this case.

The respondent in his determination of deficiency determined that the $6,166.42 received by petitioner as indicated was taxable income to him in 1956, the year of its receipt.

In explanation of his retention of the premium refunds, it was petitioner's testimony that during the last 3 months of 1956 and the first 2 months of 1957, he did not have documents substantiating the fact that the buildings were fireproof. His explanation of his failure to pay over the amounts in question to the two associations at a later date was that sometime in February of 1957, savings accounts in the name of City Insurance Agency in each of the associations were, in petition-

er's words, "frozen" when the State auditor took control of the associations. As stated by him, "The State Auditor took control of the two guarantee stock associations, and he froze up the savings accounts in each of them, that City Insurance had, and I was going to use the funds in those two accounts to reimburse each one of the associations. In other words, I was going to offset, but wasn't able to."

As to the existence of these savings accounts or how much money may have been deposited in them, all we know is what petitioner has asserted. We were not at all impressed with the explanation of his failure to make the refunds in 1956, or in 1957, prior to the seizure of the associations by the State auditor. The insurance company had satisfied itself that the buildings were fireproof, and had made the refunds, and he has given no persuasive reason why it was necessary for him to obtain independent substantiation of the conclusions of the insurance company before making the payments to the two associations which had paid the premiums in the first place. But, even so, he offers no explanation as to why the documents described were not obtained in the interval, if, in fact, they were necessary for his own satisfaction. We are not convinced that in 1956, or thereafter, petitioner recognized any valid and binding obligation to make refunds to the associations. Rather, we think that he received and held the funds for his own use and benefits and without recognition of any rights in the associations. He is deemed to have received income in that amount. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417.

Petitioner cites and relies on *Seven-Up Co.*, 14 T.C. 965, and *Broadcast Measurement Bureau, Inc.*, 16 T. C. 988. Each of those cases involved the receipt of funds, subject to a restriction that they be spent only for specified purposes. There were no such restrictions here. The determination of the respondent is sustained.

The respondent rests his claim of fraud on three items, first, that there was a substantial overpayment by City Savings to Melvin on the remodeling job and that the amounts so paid were subsequently paid to or for the benefit of petitioner in the guise of loans or by other means; second, on the $10,000 paid by Melvin to petitioner on May 28, 1956, and recorded as having been in payment for lot 1 of the 5000 block of West Jackson Boulevard; and third, on the $6,800 payment by City Savings at the direction of petitioner purportedly to Commercial Broadcasters.

Under section 6653°(b) of the Internal Revenue Code of 1954, the 50 percent addition to tax therein provided is to be added if any part of the deficiency is due to fraud. It is accordingly sufficient under the statute if petitioner, with fraudulent intent, failed to report any part of any item of income received by him thereby giving rise

to the deficiency. It is an established fact, and the petitioner does not contend otherwise, that he did not report any part of any one of the three items upon which the respondent relies in his claim of fraud. Furthermore, petitioner makes no claim or contention that his failure to report the items in question or some part or parts thereof, was due to mistake but rather his contention is that he received no such income.

With respect to the first of the three items on which respondent bases his claim of fraud, the evidence, in our opinion, amply shows and we have found as a fact that there was a gross overpayment by City Savings to Melvin in respect of the remodeling of its building; that the overpayment was advisedly caused by petitioner and some part, if not all, of the overpayment was thereafter paid over by Melvin to petitioner, and was received and used by him as his own. Aside from his contention that there was no overpayment by City Savings to Melvin which calls for no further discussion here, petitioner while admitting that he personally did receive substantial sums from Melvin during the taxable year, contends that as to $176,312.50 he only served as a conduit for its payment to Orville Hodge as a loan by Melvin to Hodge and as for the amounts received and retained by him, they were bona fide loans for the repayment of which he was obligated to Melvin, all of which is another way of saying that the funds so received by him were in fact and in toto the funds of Melvin.

Even if we assume that the funds received by petitioner from Melvin for the purported purpose of completing loans to Hodge were in fact paid over by petitioner to Hodge, the conclusion must be the same, we think, whether they were intended as a payoff or as loans. In either case such payments in some substantial part at least must be regarded as having been made for the account of petitioner. In the first place, there can be no question that Hodge in his capacity as State auditor had done and was doing favors for petitioner in respect of his wholly owned savings associations and his continued approval of construction loans by savings and loan associations was a prime objective of petitioner not only with respect to his own associations, First Guarantee and Chicago Guarantee, but with respect to his personal business operations, particularly his real estate business which in turn was dependent upon the continuation of construction loans to Melvin by City Savings, First Guarantee, and Chicago Guarantee. And in that connection it is to be remembered that it was petitioner who promoted the said "loans" by Melvin to Hodge and who by manipulating the overpayments by City Savings saw to it that Melvin had the required funds. Assuming, on the other hand, that a loan was in fact made to Hodge and repayment by him was intended, to whom would repayment be made? The act of petitioner in causing the overpayment to be made by City Savings under the guise of payments for

the remodeling of its building negates any thought or intent that City Savings would ever be repaid any of its funds so siphoned off. It could be that some part of the overpayment was ultimately to belong to Melvin as its own for its part in the transaction, but the evidence of record bars any thought or conclusion that in dealings between petitioner and Melvin, Melvin would ever be the sole or even the major beneficiary. Accordingly, we are satisfied and convinced that if any of the funds so received by petitioner from Melvin were in turn paid over to Hodge with any understanding between him and Hodge that repayment was to be made, it was petitioner's purpose and intent that in whole or substantial part he would be the ultimate recipient. And insofar as the funds purportedly loaned to petitioner represented funds diverted from City Savings under the guise of payments for the remodeling of its building the same is true as with respect to the purported loans to Hodge.

Noting the pattern of the various money transfers, petitioner's method of doing business, and his proclivity for using companies with which he occupied positions of trust for his personal benefit and gain, we have heretofore concluded that through the overpayment by City Savings to Melvin and the subsequent tranfers of funds to petitioner, he was in receipt of income. Taking into account his manipulation of funds from City Savings under the guise of payments for the remodeling of its building and through Melvin to him as outlined herein, coupled not only with his failure to record or to report any part thereof as income received but also with his denial of the receipt of any such income, it follows and we hold that his failure to report the income so received was due to fraud with intent to evade tax. We accordingly conclude and hold as we have found as a fact, that part of the deficiency herein is due to fraud and the 50 percent addition to tax provided by section 6653(b) is required.

*Decision will be entered under Rule 50.*