Nicholas M. Blassie and Clara Blassie, et al. [1] v. Commissioner. Blassie v. Commissioner
Docket Nos. 5534-63 - 5537-63.
United States Tax Court
T.C. Memo 1966-252; 1966 Tax Ct. Memo LEXIS 32; 25 T.C.M. (CCH) 1291; T.C.M. (RIA) 66252; November 18, 1966
James Nangle, Jr., for the petitioners. James F. Kennedy, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax and additions to tax of the petitioners for the following years and in the amounts indicated: Additions to tax
I.R.C. 1939
Petitioner
Year
Deficiency
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
Docket No.
5534-63
Nicholas M. Blassie and
Clara
Blassie
1952
$3,880.80
$381.24
1953
6,991.98
916.81
1954
4,464.76
$298.87
1955
3,633.73
1956
4,223.89
Docket No. 5535-63
Estate of August
Gieseke, Decd.,
Beatrice Gieseke,
Admx., and
Beatrice Gieseke
1952
3,377.26
304.81
1953
4,600.38
409.21
1954
2,590.80
248.08
1955
2,879.55
1956
3,172.35
Docket No. 5536-63
Lorell P. Hicks
1953
884.36
72.14
1954
748.27
53.98
Docket No. 5537-63
Lorell P. Hicks and
Catherine
V. Hicks
1955
918.79
1956
1,430.86
*34 Some of the issues presented in each of the cases have been conceded by the petitioners therein thus leaving for determination the correctness of the respondent's action as follows: In the Case of Nicholas M. Blassie and Clara Blassie, Docket No. 5534-63 (1) In determining that Nicholas M. Blassie, sometimes hereinafter referred to as Blassie, realized income from the receipt of various allowances from the Amalgamated Meat Cutters and Butcher Workmen of North America, Meat Cutters Union Local No. 88, AFL-CIO, sometimes hereinafter referred to as local 88, during the following years and in the indicated amounts: 1952
$ 9,868.13
1953
13,018.13
1954
11,914.20
1955
9,978.62
1956
11,854.35
(2) In determining that Blassie realized income for the years and in the amounts set out below from the payment by local 88 of various hotel, restaurant, and night club charges incurred by Blassie during the following years and in the indicated amounts: 1952
$ 474.21
1953
1,044.85
1954
655.00
1955
874.75
1956
750.38
(3) In determining that Blassie realized income from the receipt of insurance commissions in the amounts of $4,265.80, $4,384.19, *35 and $3,900.97 during 1954, 1955, and 1956, respectively, which he failed to report in his income tax returns for the respective years. (4) In determining that $110 of the deduction of $577.50 taken for contributions for 1952 and $40 of the deduction of $769.50 taken for contributions for 1953 constituted personal expenses and were not allowable deductions. (5) In disallowing deductions of $220, $335, and $325 taken for 1952, 1953, and 1954, respectively, for unreimbursed automobile expenses. (6) In disallowing a deduction of $28.39 taken for 1955 for medical expense. (7) In determining that petitioners were liable for an addition to tax under section 294(d)(1)(A) of the Internal Revenue Code of 1939 for 1952 and 1953 for failure to file a timely declaration of estimated income tax for such years. (8) In determining that petitioners were liable for an addition to tax under section 294(d)(2) of the 1939 Code for 1954 for substantial underestimation of estimated income tax for that year. In the Case of Estate of August Gieseke, Deceased, Beatrice Gieseke, Administratrix, and Beatrice Gieseke, Docket No. 5535-63 (1) In determining that August Gieseke, sometimes hereinafter *36 referred to as Gieseke, realized income for the years and in the amounts set out below from the receipt of various allowances from local 88 during the following years and in the indicated amounts: 1952
$ 9,055.32
1953
11,335.39
1954
7,693.69
1955
8,644.46
1956
9,146.24
(2) In determining that Gieseke realized income for the years and in the amounts set out below from the payment by local 88 of various hotel, restaurant, and night club charges incurred by Gieseke during the following years and in the indicated amounts: 1952
$298.04
1953
937.58
1954
416.24
1955
393.17
1956
670.38
(3) In determining that petitioners were liable for an addition to tax under section 294(d)(1)(A) of the 1939 Code for 1952, 1953, and 1954 for failure to file a timely declaration of estimated income tax for such years. In the Case of Lorell P. Hicks, Docket No. 5536-63, and in the Case of Lorell P. Hicks and Catherine V. Hicks, Docket No. 5537-63 (1) In determining that Lorell P. Hicks, sometimes hereinafter referred to as Hicks, realized income for the years and in the amounts set out below from the receipt of various allowances from local 88 during *37 the following years and in the indicated amounts: 1953
$3,281.59
1954
3,214.98
1955
4,332.67
1956
6,428.40
(2) In determining that Hicks was liable for an addition to tax under section 294(d)(1)(A) of the 1939 Code for 1953 and 1954 for failure to file a timely declaration of estimated income tax for such years. General Findings of Fact Some of the facts have been stipulated and are found accordingly. During the taxable years 1952 through 1956, Nicholas M. Blassie and Clara Blassie were husband and wife and filed their joint Federal income tax returns for such years prepared on the cash receipts and disbursements method of accounting. Their income tax return for 1952 was filed with the director and their returns for 1953 through 1956 were filed with the district director in St. Louis, Missouri. During the taxable years 1952 through 1956, August Gieseke and Beatrice Gieseke were husband and wife and filed their joint Federal income tax returns for such years prepared on the cash receipts and disbursements method of accounting. Their income tax return for 1952 was filed with the director and their returns for 1953 through 1956 were filed with the district *38 director in St. Louis, Missouri. August Gieseke died March 21, 1962, and thereafter Beatrice Gieseke was duly appointed administratrix of his estate. During the taxable years 1953 through 1956, Lorell P. Hicks and Catherine V. Hicks were husband and wife. For the taxable years 1953 and 1954 Hicks filed individual Federal income tax returns prepared on the cash receipts and disbursements method of accounting with the district director in Springfield, Illinois. For the taxable years 1955 and 1956, Hicks and his wife filed their joint Federal income tax returns prepared on the cash receipts and disbursements method of accounting with the district director in Springfield, Illinois. On September 20, 1963, the respondent sent timely notices of deficiencies to the respective petitioners herein for their taxable years here involved. During the years 1952 through 1956, Blassie was president of local 88. His salary for his services in that capacity as reported in his income tax returns for the years in issue was $13,000 a year for all of the years except 1954 when it was $13,250. Gieseke was secretary-treasurer of local 88 during the years 1952 through 1956. His salary for his services *39 in that capacity as reported in his income tax returns for the years in issue was $13,000 a year for all of the years except 1954 when it was $13,250. Hicks was a business agent of local 88 during the years 1953 through 1956. His salary for his services in that capacity as reported in his income tax returns for the years in issue was as follows for the indicated years: 1953
$5,200
1954
5,755
1955
6,180
1956
6,370
During the years 1952 through 1956, local 88 had its headquarters in St. Louis, Missouri. During those years it had approximately 2,500 members. Those members were employed in various phases of the food industry in Metropolitan St. Louis, such as in wholesale and retail meat markets, hotel and restaurant supply houses, slaughter, packing, and storage plants, and poultry and fish houses. In 1952 and 1953, local 88 issued expense allowance checks directly to Blassie and to Gieseke and in 1953 issued expense allowance checks directly to Hicks and charged the amounts of the foregoing checks on its books to "Officers' Allowances." During the latter part of 1953, the Executive Board of the local established what was termed "Contingent Fund Accounts" and *40 discontinued the "Officers' Allowances." Thereafter the local maintained separate contingent fund cash receipts and disbursement journals for Blassie, for Gieseke, and for Hicks. The ability of Blassie to bargain successfully for the members of local 88 depended upon the good will and cooperation of other locals and unions. The Executive Board of the local was familiar with his duties and activities and was of the opinion that in the conduct of such activities it was necessary for him to make expenditures of substantial amounts to maintain the goodwill of other locals and unions toward local 88, to perform public relations services in behalf of the local, and to keep the "image" of the local in what was considered to be a firstclass manner as a large local in the St. Louis community. Accordingly, for the purpose of enabling him to perform the foregoing, the Executive Board provided him and other officers with Officers' Allowances and subsequently with Contingent Fund Accounts. During the years here involved, local 88 was affiliated with the Food Council of Greater St. Louis which included other affiliated locals of the city of St. Louis and of the counties in Missouri surrounding *41 St. Louis and a portion of Illinois. Blassie was the executive officer of the Food Council of Greater St. Louis and as such held meetings and conferences with representatives of various other locals and unions. During the years in issue, local 88 was affiliated with the International Union of Amalgamated Meat Cutters which had its headquarters in Chicago, Illinois. In connection with his duties as president of local 88, Blassie frequently attended meetings with representatives of the International Union. That union also through conferences and meetings in various parts of the United States, disseminated, from time to time, information relating to the problems of organizations engaged in the poultry, meat, and packing industries and the restaurant and hotel supply business operating in many of the United States. Local 88 required its officers to use automobiles in the performance of the duties of their offices and preferred that the officers own the automobiles so used. Pursuant to a schedule set up by the local in 1934, following a revision of its constitution and bylaws in that year, the local paid, with respect to the cost of whatever kind of a new automobile an officer desired *42 to purchase, an amount equal to one-fourth of the cost of the officer's old automobile. In some instances involving special or other equipment, a larger amount than one-fourth of the cost of the old automobile was paid. The local also paid the premiums on the insurance on the new automobiles purchased by the officers. In addition, the local paid the officers 5 cents a mile for the mileage their cars were used on business for the local. The rate of 5 cents a mile had been established by the local in 1933 and thereafter continued in effect without change during the years here involved. During the years in issue, the local made payments on the purchase price of new automobiles and paid the premiums on the insurance thereon with respect to automobiles purchased by Blassie, Gieseke, and Hicks and made automobile mileage payments to them, respectively, all in amounts hereinafter shown. Nicholas M. Blassie and Clara Blassie Issue 1 Respondent's Determination That Blassie Realized Income From the Receipt From Local 88 of Various Allowances Findings of Fact During the following years Blassie received from local 88 checks totaling the indicated amounts which were charged to "Officers' *43 Allowances" on the books of the Local: Year
Amount
1952
$5,200
1953
3,900
During the following years local 88 transferred to Blassie's Contingent Fund Account by checks totaling the indicated amounts: Year
Amount
1953
$2,600
1954
3,900
1955
5,300
1956
5,200
During the following years Blassie received from local 88 checks totaling the indicated amounts which were charged on the books of the local to "Auto Mileage": Year
Amount
1952
$627.10
1953
932.30
1954
938.67
1955
931.45
1956
721.20 During the following years Blassie received from local 88 checks
totaling the indicated amounts which were charged on the books of the
local to "Traveling, Convention and Conference Expenses": Year
Amount
1952
$2,212.09
1953
3,850.00
1954
2,075.67
1955
2,988.46
1956
3,563.59
During the following years Blassie received from local 88 other checks totaling the indicated amounts: Year
Amount
1953
$ 65.00
1954
21.00
1955
71.75
1956
129.39
During the following years local 88 issued checks totaling the indicated amounts to payees most of which were hotels, restaurants, and *44 cafes: Year
Amount
1952
$ 51.95
1953
137.88
1954
88.54
1955
477.79
1956
680.89
During the following years local 88, as payment of new automobile allowances to Blassie on new automobiles purchased by him in those years and titles to which were taken in his name, issued to automobile dealers checks totaling the indicated amounts: Year
Amount
1952
$1,454.06
1953
1,392.19
1954
4,653.57
1956
1,376.50
The following statement shows the dates on or about which Blassie purchased his new business automobiles, his used automobile allowances, and the purchase price thereof: Used
automobile
Purchase
Date of Purchase
allowance
price
February 14, 1952
February 11, 1953
$4,135.00
$5,519.03
February 25, 1954
3,803.04
6,329.10
December 24, 1954
4,225.55
6,353.06
1956 not shown
During the following years local 88 paid the amounts indicated as premiums on the insurance on the new automobiles purchased by Blassie and referred to in the preceding paragraph: Year
Amount
1952
$322.93
1953
140.76
1954
236.75
1955
209.17
1956
182.78
The following statement summarizes the foregoing items *45 comprising "Income from receipt of expense allowances" stated in the notice of deficiency for the years in issue: Description
1952
1953
1954
1955
1956
Checks payable to
Blassie - Offi-
cer's Allowance
$5,200.00
$ 3,900.00
$
$
$
Checks transferred to
Blassie's
Contingent Fund Account
2,600.00
3,900.00
5,300.00
5,200.00
Checks payable to
Blassie - Auto-
mobile Mileage
627.10
932.30
938.67
931.45
721.20
Checks payable to
Blassie -
Travel, Convention and
Con-
ference Expenses
2,212.09
3,850.00
2,075.67
2,988.46
3,563.59
Other checks payable to
65.00
21.00
71.75
129.39
Blassie
Checks paid to Third
51.95
137.88
88.54
477.79
680.89
Parties
Checks - New Automobile
Allow-
ances
1,454.06
1,392.19
4,653.57
1,376.50
Premium Payments -
Insurance on
New Automobiles
322.93
140.76
236.75
209.17
182.78
Total
$9,868.13
$13,018.13
$11,914.20
$9,978.62
$11,854.35
In determining the deficiencies here involved the respondent determined the foregoing total amounts for the respective taxable years constituted income to the petitioners which they had failed to report in their income tax returns for such *46 years. Further, in determining the deficiencies the respondent did not allow the petitioners any deductions with respect to the foregoing total amounts unless such deductions were included and allowed as itemized deductions (nonbusiness deductions) on the income tax returns of the petitioners for the years in issue. During 1952 through 1956 the "ruling power" of local 88 was its Executive Board. Blassie's position as president of the local was an elective one. As a member of the Executive Board and as president of the local, Blassie was one of the influential members of the local. He and Gieseke were in charge of the administration of the affairs of the local. As president of local 88, Blassie's duties during the years 1952 through 1956 consisted of being chairman and head of the committees of the local which dealt with the various functions of the local, including medical programs, organization work, and organizing and supervising the overall functions of the local. He participated in all of the negotiations of contracts involving members of local 88. In such participation during the years in issue he dealt with several hundred employers who were engaged in various phases of the *47 food business. Blassie also had dealings with other unions which were affiliated with the Food Council of Greater St. Louis. Most of Blassie's time was spent with business agents of local 88 who also were officers of the local and with business agents or representatives of other locals with which local 88 was associated. In the discharge of his duties Blassie was required to do considerable traveling in and around the St. Louis, Missouri, area and elsewhere in that State. In addition, he was required to travel to various places outside of Missouri. During the years in issue, Blassie also was required to do a considerable amount of entertaining, some of which was in his home and the remainder was away from, home. Almost all of Blassie's entertainment was of officers and other representatives of associate locals and unions, persons connected with the Food Council of Greater St. Louis, employers of members of local 88, associate officers and members of committees of local 88, civic leaders, and government officials, and was for the benefit of the business of the local. Blassie, as president or representative of local 88, frequently was called upon by civic, business, and labor leaders *48 and others to make personal contributions to various civic, charitable, educational, and religious or other organizations or groups. In general, the contributions made by him to them were in comparatively modest amounts. Blassie also made some political contributions. Blassie used in the performance of his duties as president of local 88 the automobiles, part of the purchase price of which was paid by the local and which sometimes hereinafter are referred to as his business automobile or automobiles. Such automobiles were acquired in trade-ins of his old automobile in which he received for his old automobile an allowance on the purchase price of the new automobile purchased. All of the new automobiles purchased by Blassie were Cadillacs. From about July 1952 through 1956 Blassie also owned another automobile, sometimes hereinafter referred to as his second automobile. At times, when his business automobile was being serviced or repaired, he used his second automobile in the performance of his duties as president of the local. During the years in issue, Blassie used his business automobile 90 percent of the time for business purposes of the local. The petitioners were not allowed *49 any deduction for depreciation of Blassie's business automobiles. In July 1953, Blassie moved into the home in House Springs, Missouri, in which he thereafter resided through 1956. The distance from that home to the office of local 88 is approximately 23 miles. Upon leaving home in the morning, Blassie's first stop normally was to meet with a business agent or agents of the local. If Blassie's first stop in the morning was to attend a meeting with business agents of the local, the greatest distance he would travel from his home for such a meeting was 80 miles. A trip such as 60 to 80 miles would occur about once a month. When prior to leaving St. Louis on business for local 88 Blassie received from the local a travel advance, he would be reimbursed by the local for any amount he spent in excess of the advance upon informing Gieseke orally or by notations of the amount of the excess. If Blassie spent more money than the amount of the advance and was not reimbursed therefor, it was because he did not feel justified in submitting a bill to the local for the excess. On occasions when he did not receive an advance prior to making a trip, he received payment for his expenses after his *50 return. On other occasions during 1953 through 1956, Blassie made payments from out-of-pocket or otherwise from his individual funds, for or on behalf of the business of the local for which he was not reimbursed. In some instances the International Union engaged Blassie to perform certain assignments for it and with respect to some of the assignments, it bore all of his traveling expenses. In the case of other of the assignments, International bore a portion of his traveling expenses and he bore the remainder. With respect to an assignment by the International Union in 1956 which involved a trip to Rome, Italy, and the Holy Land, the International Union bore one-half of his traveling expenses and he bore the remainder. The minutes of the Executive Board, nightworkers, and regular general meetings of local 88 indicate the following out-of-town trips of Blassie for the following years: 1952
1953
Cincinnati, O.
Florida
Jefferson City, Mo.
Stockholders Meeting
Kroger & Co.
- Kroger & Co.
stockholders meeting
Jefferson City, Mo.
Champaign, Ill. &
Jefferson City, Mo.
New York City
Litchfield, Ill.
Chicago, Illinois
Springfield, Ill.
San Francisco,
Portland, Oregon
California
Chicago, Illinois
*51 The following cities are noted in Blassie's appointment book on or about the dates shown: To
1955
From
approximately
Hotel
Travel
Louisville, Ky.
5/28/55
Jefferson City, Mo.
10/ 7/55
Chicago, Ill.
10/ 8/55
Kansas City, Mo.
11/21/55
Detroit, Mich.
11/ 8/55
Cincinnati, O.
12/ 9/55
12/13/55
1956
Springfield, Mo.
1/13/56
1/15/56
Washington, D.C.
4/21/56
4/22/56
New York, N. Y.
5/15/56
5/20/56
Chicago, Ill.
8/16/56
8/17/56
Rome, Italy
8/19/56
9/ 6/56
Jefferson City, Mo.
9/10/56
Cincinnati, O.
12/14/56
Miami, Fla.
12/ 5/56 Blassie made practically all of the trips to the foregoing cities and where there had to be a change in his plans, Gieseke made the trips. The following out-of-town trips were made by Blassie for the periods indicated: To
1955
From
approximately
Hotel
Travel
Jefferson City, Mo.
1/ 4/55
1/ 5/55
X
X
Springfield, Mo.
1/ 7/55
1/ 9/55
X
X
Chicago, Ill.
2/28/55
X
X
New York, New York
3/14/55
3/17/55
X
Jefferson City, Mo.
3/30/55
X
X
Jefferson City, Mo.
4/12/55
X
Jefferson City, Mo.
4/26/55
X
X
Chicago, Ill.
4/29/55
5/ 5/55
X
X
Cincinnati, O.
5/26/55
X
Jefferson City, Mo.
6/25/55
6/29/55
X
Chicago, Ill.
8/ 5/55
8/ 8/55
X
Jefferson City, Mo.
9/13/55
9/14/55
X
X
Rock Island, Ill.
10/ 9/55
10/12/55
X
New York, N. Y.
10/20/55
10/24/55
X
X
1956
Atlantic City, N.J.
3/22/56
3/24/56
X
X
Kansas City, Mo.
4/ 6/56
4/11/56
X
Detroit, Mich.
4/20/56
X
X
Chicago, Ill.
5/ 9/56
5/11/56
X
X
Jefferson City, Mo.
5/27/56
5/28/56
X
Cincinnati, O.
6/ 9/56
6/17/56
X
Chicago, Ill.
8/ 3/56
X
X
Cincinnati, O.
8/10/56
8/12/56
X
X
New York, N. Y.
8/18/56
X
Springfield, Ill.
10/ 5/56
10/10/56
X
Chicago, Ill.
10/23/56
10/26/56
X
Louisville, Ky.
10/27/56
10/28/56
X
X
Chicago, Ill.
11/29/56
12/ 1/56
X
X
*52 The trips with an "X" under the heading "Hotel" were trips where charges to hotel bills (which included room, restaurant, phone, valet, and beverage charges) were paid directly to the hotel furnishing the services by local 88 and were charged against the general fund of the local. The trips with an "X" under the heading "Travel" were trips where rail and airline transportation charges were paid directly by local 88 to the business entity providing the transportation and were charged directly against the general fund of the local. An undisclosed portion of these payments by local 88 of the charges for Blassie's hotel bills was determined by the Commissioner to constitute additional income to Blassie. The Receipts and Disbursement General Fund Records (cash disbursement books) of local 88, inter alia, contain the following information respecting checks issued by the local and made payable to Blassie: 1955
Date
Amount
Notation
1/ 4/55
$350.00
Expenses Jefferson City
2/ 1/55
190.00
89th Convention, Jan. 7th, Springfield, Mo.
3/ 4/55
165.00
Exp. Nat. Retail. Con. Mtg. Chicago
3/10/55
300.00
N. Y. Check on Co-Op Hospital and Local Union Housing
4/27/55
400.00
Natl. Conf. Chicago, Ill.
5/13/55
110.00
Jeff. City Legislative Mtg. March 30, April 12, April 26
6/24/55
446.00
Mo. State Fed. Conv. Jeff. City Exp.
8/12/55
103.00
Chicago Conf. A & P cutting plant
10/ 6/55
500.00
Exp. Ill. State Convention
10/19/55
250.00
Conference & Central Cutting Plant A & P Investigations,
Newark, N.J.
3/21/56
200.00
International Board Meeting in Atlantic City
4/ 5/56
250.00
Exp. allowance Mo. State Fed. Conv.
5/ 8/56
200.00
Inter. Exec. Bd. Meeting in Chicago dispute
6/ 1/56
96.50
Exp. to N. Y. Fur Industry
6/ 1/56
600.00
Convention Exp. Cincinnati, Ohio 6-9-56
8/ 3/56
250.51
Chicago cash expenses checking on prepackaged meats
8/16/56
318.28
Exp. Ohio State Fed. Conf.
10/ 3/56
500.00
Ill. State Conventions
11/ 5/56
138.20
Expenses Stockholders Mtg. & Int'l Officers Mtg. NY &
Louisville
11/23/56
250.00
Exp. Int'l. office Conference regarding Swift & Co. &
other matters
12/20/56
362.00
Plane fare & Gen. Exp. Cinn. Kroger Conf. Louisville,
Ky. Int'l. &
Food Council Conference
*53 Ultimate Findings of Fact Item 1 During the taxable years shown below Blassie paid on behalf of and for the business purposes of local 88 the following amounts with respect to the indicated items: 1953
1954
1955
1956
Automobile expenses
$ 508.51
$ 844.25
$ 868.29
$ 721.45
Contributions, advertising,
tickets, etc.
1,409.00
1,629.14
2,614.02
1,902.50
Entertainment, food, and
beverages
1,378.78
3,049.76
2,671.06
1,600.00
Travel
67.34
61.98
164.19
364.59
Miscellaneous
100.00
100.00
151.99
110.16
Total
$3,463.63
$5,685.13
$6,469.55
$4,698.70
Item 2 The following amounts included by respondents in the net income of the petitioners for the indicated years with respect to "Checks paid to Third Parties" represented payments made by local 88 for its own business purposes: Year
Amount
1952
$ 51.95
1953
137.88
1954
88.54
1955
477.79
1956
680.89
Item 3 During the taxable years 1953 through 1956, Blassie made out-of-pocket unreimbursed payments for miscellaneous expenses incurred for and on behalf of the business of local 88 of an amount of $900 a year. Item 4 Blassie's automobiles by reason *54 of their use in the business of local 88 during the years 1952 through 1956 sustained depreciation thereof of $400 a year for each of those years. The amounts shown above in items 1, 2, 3, and 4 are deductible for the respective taxable years from the total amounts of additional net income determined by respondent in the notice of deficiency here involved with respect to the instant issue. Opinion As shown by our findings, the respondent has determined substantial increases in the net income of the petitioners for the years in issue. He concedes that in making his determination he has not allowed any amounts as deductions with respect to the various items and amounts involved unless they are included in itemized deductions - nonbusiness deductions - taken in the returns of the petitioners and allowed by him. The record herein indicates that such allowances were small in amounts in comparison with the amounts of net income determined by respondent. The overall position taken by petitioners with respect to this issue is substantially that the allowance and Contingent Fund allocated to Blassie and payments made by local 88 to third parties for expenditures or charges incurred *55 by him were all moneys expended by the local or Blassie on behalf of and for the business purposes of the local and that therefore Blassie did not receive any taxable income from receipt of the allowance, Contingent Fund Account and payments to third parties as those funds constituted ordinary and necessary business expenses within the provisions of the Internal Revenue Code. The respondent's overall contention is that petitioners have failed to substantiate their position. As a consequence of the foregoing, the primary question presented is that of determining whether, or to what extent, the petitioners have substantiated their position. Concededly Blassie did not currently over the years in issue keep books which would show his disposition of the various sums advanced to him by local 88 by way of Officers' Allowances and his Contingent Fund Account and otherwise and the purpose or purposes for which such disposition was made or which would show the purposes for which he incurred charges that were paid by the local. In the absence of such books, the petitioners rely on the testimony of Blassie and others, together with a number of exhibits in the record which were derived from various *56 checks issued by Blassie on his bank account and checks issued by him on his Contingent Fund Account. From our consideration as a whole of the record relating to the instant issue in connection with the arguments and contentions of the parties and with the use of the rule of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), where applicable, we have concluded and found the amounts set out in our Findings of Fact to be deductible from the total amounts of additional net income of petitioners. In determining the aforementioned amounts we have not included items and amounts shown for political contributions since we have not found anything in the record to indicate that the arrangement under which Blassie's Officers' Allowance and his Contingent Fund Account were made, required or contemplated such allowance and fund were to be used for making contributions of that character on behalf of and for the business purposes of local 88. Since the amounts determined in our findings as to the instant issue are overall amounts and since we are unable to determine from the record the exact amounts thereof which respondent has allowed with respect to such items as nonbusiness deductions, *57 such allowances of nonbusiness deductions, where in order to prevent double deductions, will be eliminated from nonbusiness deductions in a recomputation of deficiencies under Rule 50. Issue 2 Respondent's Determination That Blassie Realized Income From the Payment by Local 88 of Various Hotel, Restaurant, and Nightclub Charges Incurred by Him Findings of Fact The respondent increased the net income of the petitioners for the following years by the indicated amounts representing payments made by local 88 to various hotels, restaurants, and nightclubs of charges incurred by Blassie: Year
Amount
1952
$ 474.21
1953
1,044.85
1954
655.00
1955
874.75
1956
750.38
The foregoing charges were incurred by Blassie for travel, food, and refreshments during trips made by him on behalf of and for the business purposes of the local. Opinion Accordingly, we hold for the petitioners on this issue. Issue 3 Respondent's Determination That Blassie Realized Income from the Receipt of Insurance Premiums Findings of Fact During 1952, if not prior thereto and continuing since, local 88 has had what is known as the Benevolent Society, sometimes hereinafter referred *58 to as Benevolent. The membership of Benevolent consisted of those members of the local who made payments to Benevolent in order to obtain benefits which were in addition to those provided by the local's then health and welfare program. During the years in issue the local had approximately 2,500 members of whom approximately 500 were also members of Benevolent. About the end of 1952, Blassie and other officers of local 88 were desirous of the local avoiding payment to an outside broker of commissions on the insurance carried with respect to the local's health and welfare program. Blassie was asked by other undisclosed officers of local 88 to apply for an insurance broker's license. Blassie applied for and on or before January 27, 1953, was granted an insurance broker's license by the State of Missouri. He then was asked if he would turn over to Benevolent the commissions which would be forthcoming to him as broker with respect to the insurance relating to the local's health and insurance program. This he agreed to do. Blassie continued to be licensed as an insurance broker during the years 1954 through 1956. On January 27, 1953, at a regular general meeting of local 88 and its Executive *59 Board and nightworkers, Blassie stated that he had been "commissioned an insurance broker and all brokerage fees he received would be donated to the Benevolent Society." On January 29, 1953, the Local 88 Meat and Related Industries Welfare Fund, sometimes hereinafter referred to as the Fund, was formed. Under the terms of the trust, the board of trustees of the Fund was composed of two representatives from management, two representatives from labor, and one representative from the general public. From January 29, 1953 to December 3, 1953, Howard Hess and Oliver Schnitker represented management on the board. Blassie and Gieseke represented labor, and George Marklin originally was the member from the general public and chairman trustee and administrator of the program. Occidental Life Insurance Company, sometimes hereinafter referred to as Occidental, was the underwriter of the Fund's insurance policy for 1953. In the latter part of that year, Occidental informed the trustees that perhaps there was a conflict of interest between Marklin's position as a trustee of the Fund and his duties as administrator of the Fund's program. As a consequence, Marklin resigned his position as a trustee *60 of the Fund, but, at the request of the other trustees, continued his services as administrator of the Fund's program. Thereafter he continued as administrator beyond the years involved herein. His duties as such included collection of accounts, collection of money from management, the handling of claims for eligibility, and all other matters that are customarily performed in behalf of the health and welfare program. He also handled some of the negotiations with the underwriter of the Fund. About the time of or shortly after Marklin's resignation as a trustee of the Fund, Blassie and Gieseke, the trustees of the Fund who represented labor, informed Hess and Schnitker, the trustees who represented management, that for the benefit of local 88 a change for the following year would be made from Occidental to Amalgamated Labor Life Insurance Company as underwriter of the Fund. Amalgamated was a new company with headquarters in Chicago, Illinois, which had been organized by the International Union of Meat Cutters and the contention of Blassie and Gieseke at that time was that if any insurer could provide reasonable insuance rates, Amalgamated could, particularly in view of its labor union *61 origin. Upon being informed as to the change, Hess and Schnitker, who were satisfied with Occidental and were unacquainted with Amalgamated, expressed to Blassie and Gieseke their objections to the change and thereafter on December 3, 1953, resigned as trustees of the Fund. One reason for the resignation of each was the switch of the insurance from Occidental to Amalgamated. During the period of the trusteeship of Hess and Schnitker, Blassie did not tell them he was the broker in placing the insurance of the Fund with Amalgamated. Roland Maurath was a member of the board of trustees of the Fund from January 1954 until the first part of 1957. At the beginning of his trusteeship he did not know that Blassie was acting as broker in placing the insurance of the Fund. Upon learning later in 1954 that Blassie was receiving commission checks from the placing of the Fund's insurance, Maurath made objection to Blassie about the latter receiving commission checks from the Fund's insurance and turning over the checks to Benevolent instead of to the Fund. Thereafter during his trusteeship Maurath several times repeated his objection to Blassie and finally resigned because of Blassie's action *62 in continuing to receive commission checks and turning them over to Benevolent instead of the Fund. During the following years Blassie received the indicated amounts as commissions or other remuneration in connection with insurance purchased by Local 88 Meat and Related Industries Welfare Fund (including insurance purchased for the poultry workers program): Year
Amount
1954
$4,265.80
1955
4,384.19
1956
3,900.37
Blassie was the broker of record in placing the the above-mentioned insurance from which he received the foregoing commissions. At every membership meeting of the Executive Board and every membership meeting of local 88, the recording secretary read off the amounts of checks received by Blassie in the form of commissions from the Fund insurance and Blassie subsequently forwarded said amounts to Benevolent. Frequently during 1954 through 1956, Blassie stated at meetings of local 88 that he had received a designated number of checks for commissions which he would turn over to Benevolent. The petitioners did not report in their income tax returns for the years 1954 through 1956 the above-stated amounts received as commissions by Blassie during such *63 years. Opinion This issue results from an amended answer filed by respondent wherein he alleges that the amounts involved constituted taxable income to Blassie and should have been reported in the income tax returns of the petitioners for the respective years in which Blassie received them and requests an increase in the deficiencies for such years. Accordingly the burden is on the respondent with respect to this issue. Although a stipulation filed by the parties shows that on January 27, 1953, at a regular general meeting of local 88 and its Executive Board and nightworkers, Blassie stated that he had been commissioned an insurance broker and all brokerage fees he received would be donated to the Benevolent Society and although the parties have stipulated that Blassie received the amounts in question "as commissions or other remuneration in connection with insurance purchased by Local 88 Meat and Related Industries Welfare Fund (including insurance purchased for the poultry workers program)," the petitioners contend that Blassie viewed himself as, and that he was, an agent or conduit for the purpose of receiving the commissions and transmitting them to Benevolent and accordingly *64 was not taxable thereon. The petitioners also contend that no services were performed by Blassie as an insurance broker since the negotiations with the insurer were handled by the administrator of the Fund. Whatever may have been the mechanics involved in the procurement of the insurance in the first instance, and its continuance in effect thereafter, the stipulation of the parties that Blassie received the amounts in question as commissions or other remuneration in connection with the insurance purchased by the Fund makes clear that such amounts were in payment to Blassie for the services required of him as an insurance broker, whether rendered by him personally, or for him by another. In view of the record presented as to this issue, we are unable to conclude that Blassie was merely an agent or conduit for the purpose of receiving the amounts in question and transmitting them to Benevolent. In our view of the record, Blassie, as an insurance broker, received the amounts "as commissions or other remuneration in connection with insurance purchased by" the Fund. In support of his allegation that the amounts here involved constituted taxable income to Blassie for the years in question, *65 the respondent relies on Lucas v. Earl, 281 U.S. 111 (1930), and cases stemming therefrom, including, inter alia, Charles Oran Mensik, 37 T.C. 703 (1962), affd. 328 F. 2d 147 (C.A. 7, 1964), certiorari denied 379 U.S. 827 (1964). In Lucas v. Earl, supra, the issue presented was whether the taxparer could be taxed on the whole of salary and attotney's fees earned by him during the taxable years there involved, or should be taxed for only one-half of them in view of a contract with his wife made many years prior to the taxable years which provided, among other things, that any salaries or fees thereafter acquired by either should be held by them as joint tenants. In holding that the salaries and fees in question were taxable in whole to the taxpayer, the Court stated that decision of the case turned on the import and reasonable interpretation of the applicable taxing act and said: There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting *66 even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew. In the Mensik case the issue presented was whether commissions earned by Mensik on sales of insurance to friends, relatives, and employees but which he voluntarily waived, or assigned his right thereto to another, constituted taxable income to him. Following the rule of Lucas v. Earl, supra, we held that the commissions were taxable to Mensik. In our opinion the holdings in Lucas v. Earl, supra, and the Mensik case are applicable and controlling here and accordingly we hold for the respondent on this issue. Issue 4 Respondent's Disallowance of Deductions for Contributions Findings of Fact In their income tax return for 1952 the petitioners took deductions for contributions itemized as follows: Sisters of St. Joseph
$70
Elk dues and charities
40
In their income tax return for 1953, the petitioners took a deduction for a contribution shown as B.P.O.E. *67 #9, $40. In determining the deficiencies for the respective years the respondent determined that the foregoing deductions were personal expenses and accordingly disallowed them as deductions. Opinion The petitioners argue on brief that the respondent's determination presents two questions, namely, (1) whether the contributions made by Blassie to the named contributees were made for the benefit and business purposes of local 88 and (2) if such contributions are determined to be personal expenses of Blassie, then whether they are deductible by petitioners as charitable contributions. Respecting the first of the above questions, the petitioners do not point us to anything in Exhibit 16 relating to Blassie's expenditures for 1952 with respect to his Officers' Allowance for that year which shows payment of the two contributions deducted for 1952. Nor do we find anything in the exhibit indicating such payment. Likewise the petitioners do not point us to anything in Exhibit 17 relating to Blassie's expenditures for 1953 with respect to his Officers' Allowance for that year and in Exhibit 21 relating to his Contingent Fund Account for that year which shows payment of the contribution *68 deducted for 1953. Nor do we find anything in the exhibits indicating such payment. In such a situation it would appear that the deductions in question were independent of and unrelated to the funds provided Blassie under the arrangement whereby he received his Officers' Allowance and Contingent Fund Account. Respecting the second of the above-stated questions, the respondent has determined that the deductions in issue represented personal expenses and that as such they were not allowable as deductions. Since the respondent's action is presumed to be correct unless it is shown to be erroneous, and since the petitioners have not shown it to be erroneous, the respondent's action is sustained. Issue 5 Disallowance by Respondent of Deductions for Unreimbursed Automobile Expenses Findings of Fact In their income tax returns for 1952, 1953, and 1954, the petitioners deducted the amounts of $220, $335, and 325, respectively, for unreimbursed expenses for use of automobile in business. The returns contained no schedules or other explanation showing the method and factual basis employed by petitioners in computing the foregoing amounts. The respondent disallowed the deductions with *69 the explanation that the petitioners had not established that such amounts constituted ordinary and necessary business expenses or that the amounts thereof had been expended for the designated purpose. Opinion The petitioners do not point us to anything in the record nor do we find anything therein to indicate the method and factual basis employed by them in computing the amounts here involved or to show a proper method and factual basis for here determining the amounts, if any, that are properly deductible with respect to the instant issue. Accordingly, the respondent is sustained as to this issue. In connection with the foregoing we observe that the parties have stipulated that petitioners have not been allowed any deductions by respondent for depreciation for the years in issue with respect to the use by Blassie of his business automobiles in the business of local 88. Without in anywise having attempted to establish the basis for the allowance of depreciation on the automobiles as provided in section 114 (a) of the Code of 1939 and section 167(f) of the Code of 1954 and a proper rate for the computation of depreciation, the petitioners take the position on brief that the amounts *70 paid by the local toward the purchase of the new automobiles can be reasonably found to be equal to the epreciation allowable on the automobiles. The petitioners cite us to no authority for such position and we know of none. It has been held that the amount of the trade-in value allowed on an automobile which has been used in a trade or business for a given period cannot be said to determine the amount or the rate of the depreciation to be allowed on it in any year of its use. Thos. Goggan & Bro., 45 B.T.A. 218, 225 (1941). Such being the case we fail to see how the new automobile allowances paid by local 88 for Blassie can be any more determinative. Since the provisions of the Codes respecting the basis on which depreciation of property is to be allowed are specific and they and evidence as to the proper rate of depreciation are to be employed in computing depreciation allowances, and since petitioners have failed to comply therewith, the contention of the petitioners is not sustained. We have found that Blassie's automobiles were used in the business of local 88 during the years in issue and are of the opinion that as a result of such use there was some physical *71 depreciation of them. As the record stands we are unable to determine with exactness the amounts thereof. Being of the opinion that not to allow some amounts would be error, we have applied the rule of Cohan v. Commissioner and found the amounts thereof as set out in our findings. Issue 6 Respondent's Disallowance of a Deduction Taken by Petitioners for Medical Expense Opinion In their income tax return for 1955 the petitioners took a deduction in the amount of $28.39 for medical and dental expenses which the respondent denied. In explanation of his disallowance of the deduction, the respondent stated in the notice of deficiency that the disallowance was due to the increase in the amount of the adjusted net income of the petitioners resulting from the various adjustments contained in the notice of deficiency. The statement in the brief of petitioners of the points relied on by them does not contain any reference to the instant issue. The respondent indicates on brief that disposition of the question is dependent on a recomputation of the adjusted net income of the petitioners pursuant to our other holdings herein. Accordingly, disposition of the question will be made in the *72 recomputation under Rule 50 of the deficiency in tax of the petitioners for 1955. Issue 7 Respondent's Determination That Petitioners Were Liable for the Addition to Tax Provided in Section 294(d)(1)(A), I.R.C. 1939, for 1952 and 1953 for Failure To File Timely Declarations of Estimated Income Tax for Those Years Findings of Fact Blassie's salary reported in the income tax returns of the petitioners for each of the years 1952 and 1953 was $13,000. In their return for 1952 the petitioners reported and were allowed four exemptions. In their return for 1953 the petitioners reported and were allowed three exemptions. The respondent determined that the petitioners did not file timely declaration of estimated tax for 1952 and 1953 and accordingly determined an addition to tax under section 294(d)(1)(A) of the Code of 1939 for each of the years. Opinion The petitioners take the position on brief that the income tax on their income was withheld as the income was earned, that they were not required to file declarations of estimated income tax for the years in issue, and that if, as they contend here, there are no deficiencies in income tax, they cannot be held to have underestimated *73 their income. Section 58 of the Code of 1939 [2] provided, in pertinent part, that every individual, with certain exceptions not material here, shall, at the time prescribed in subsection (d), make a declaration of his estimated tax for the taxable year if (1) his gross income from wages can reasonably be expected to exceed the sum of $4,500 plus $600 with respect to each of his exemptions, or (2) his gross income from sources other than wages can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more; that the declaration shall state (1) the amount which he estimates as the amount of tax for the taxable year, without regard to any credits under sections 32 and 35 for taxes withheld at source and without regard to tax imposed on self-employment income, (2) the amount which he estimates as the credits for the taxable year under sections 32 and 35, and (3) the excess of the amount estimated under (2) shall be considered the estimated tax for the taxable year. *74 Since Blassie's salary for each of the years 1952 and 1953 was $13,000 and since the total of $4,500 plus $2,400, representing four exemptions for 1952, equals $6,900, and since $4,500 plus $1,800, representing three exemptions for 1953, equals $6,300, we think it is apparent that under the provisions of section 58 he was required to file a declaration of estimated income tax for each of the years 1952 and 1953. Section 294(d)(1)(A) of the Code of 1939 [3] imposes an addition to tax in case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to be due to reasonable cause and not to willful neglect. *75 While the record does not show any facts as to the failure of the petitioners to file declarations of estimated tax for 1952 and 1953, the petitioners appear, in their statement of position, supra, to rest their failure upon the fact that income tax was currently withheld on their income as it was earned and on their opinion that they were not required to file declarations of estimated tax. Such opinion has been clearly refuted above. Nor does the fact that the tax was withheld on their income as it was earned aid them here. Herman J. Romer, 28 T.C. 1228 (1957). The addition to tax under section 294(d)(1)(A) is mandatory unless petitioners show that their failure to file declarations of estimated tax was due to reasonable cause and not willful neglect. Rene R. Bouche, 18 T.C. 144 (1952), taxpayer's appeal dismissed nol. pros. (C.A. 2, 1954). Since the petitioners have not made such a showing, the respondent's action in determining that they were liable for additions to tax is sustained. The amounts of such liability will be determined in a redetermination of the deficiencies in tax for 1952 and 1953 under Rule 50. Issue 8 Respondent's Determination *76 That Petitioners Were Liable for the Addition to Tax Provided in Section 294(d)(2), I.R.C. 1939, for 1954 for Substantial Underestimation of Estimated Income Tax for That Year Opinion Section 6554(h) of the Code of 1954 provides that "section 294(d) of the Internal Revenue Code of 1939 shall continue in force with respect to taxable years beginning before January 1, 1955." Consequently section 294(d)(2) of the Code of 1939 is applicable to petitioners' taxable year 1954. Pertinent portions of section 294(d)(2) are set out below. [4] The petitioners have not submitted any evidence with respect to the instant issue and their position as to it is the same as in issue 7. In the event a recomputation of the deficiencies under Rule 50 pursuant to our findings and holdings as to the other issues herein shows that the petitioners have substantially underestimated their estimated tax liability for 1954, the respondent's determination that they were liable for an addition to tax under section 294(d)(2) will be sustained and the amount of such addition will be determined accordingly. *77 Estate of August Gieseke, Deceased, Beatrice Gieseke, Administratrix, and Beatrice Gieseke Issue 1 Respondent's Determination That Gieseke Realized Income From the Receipt From Local 88 of Various Allowances Findings of Fact During the following years Gieseke received from local 88 checks totaling the indicated amounts which were charged to "Officers' Allowances" on the books of the local: Year
Amount
1952
$5,200
1953
3,900
During the following years local 88 transferred to Gieseke's Contingent Fund Account by checks totaling the indicated amounts: Year
Amount
1953
$2,600
1954
3,900
1955
5,300
1956
5,200
During the following years Gieseke received from local 88 checks totaling the indicated amounts which were charged on the books of the local to "Auto Mileage": Year
Amount
1952
$527.05
1953
589.90
1954
517.85
1955
416.50
1956
468.25
During the following years Gieseke received from local 88 checks totaling the indicated amounts which were charged on the books of the local to "Traveling, Convention and Conference Expenses": Year
Amount
1952
$1,965.00
1953
3,183.62
1954
1,650.00
1955
1,650.00
1956
2,000.00
*78 During the following years local 88 issued checks totaling the indicated amounts to third parties: Year
Amount
1952
$ 10.00
1953
30.88
1954
20.88
1955
106.96
1956
321.38
During the following years local 88, as payment of new automobile allowances to Gieseke on new automobiles purchased by him in those years and titles to which were taken in his name, issued to automobile dealers checks totaling the indicated amounts: Year
Amount
1952
$1,090.51
1953
911.48
1954
1,398.21
1955
986.00
1956
979.77
The foregoing payments were made on automobiles purchased by Gieseke on or about the following respective dates: March 4, 1952, March 27, 1953, February 26, 1954, February 19, 1955, March 8, 1956 During the following years local 88 paid the amounts indicated as premiums on the insurance on the new automobiles purchased by Gieseke and referred to in the preceding paragraph: Year
Amount
1952
$262.76
1953
119.51
1954
206.75
1955
185.00
1956
176.84
The following statement summarizes the foregoing items comprising "Income from receipt of expense allowances" stated in the notice of deficiency for the years in *79 issue: Description
1952
1953
1954
1955
1956
Checks payable to Gieseke
$5,200.00
$ 3,900.00
- Officer's Allowances
Checks - Transferred to
Gieseke's Contingent
Fund Account
2,600.00
$3,900.00
$5,300.00
$5,200.00
Checks payable to Gieseke
527.05
589.90
517.85
416.50
468.25
- Auto Mileage
Checks payable to Gieseke
- Travel, Convention
and Conference Expenses
1,965.00
3,183.62
1,650.00
1,650.00
2,000.00
Checks paid to Third
10.00
30.88
20.88
106.96
321.38
Parties
Checks - New Automobile
1,090.51
911.48
1,398.21
986.00
979.77
Allowances
Premium Payments -
Insurance on New Auto-
mobiles
262.76
119.51
206.75
185.00
176.84
Total
$9,055.32
$11,335.39
$7,693.69
$8,644.46
$9,146.24
In determining the deficiencies here involved the respondent determined that the foregoing total amounts for the respective taxable years constituted income to petitioners which they had failed to report in their income tax returns for such years. In determining the deficiencies the respondent did not allow the petitioners any deductions with respect to the foregoing total amounts and did not allow the petitioners any deductions *80 for depreciation with respect to the automobiles purchased by Gieseke and used by him in the business of local 88 during the years in issue as to which automobiles he received New Automobile Allowances from the local. As secretary-treasurer of local 88 Gieseke was its office manager. He also was a member of the local's Executive Board and attended its meetings as well as meetings of the local and other meetings where health and welfare matters were involved. As secretary-treasurer of the local, Gieseke supervised the keeping of its books of account. During the years in issue Gieseke's duties sometimes required him to work long hours and on weekends. Several times each year Gieseke's duties required him to make out-of-town trips. On some of such trips Gieseke accompanied Blassie. On others, Gieseke went alone. Gieseke's duties also required him to make expenditures for entertainment. During the years in issue Gieseke had only one automobile at any given time and he was the sole driver of it. Ultimate Findings of Fact Gieseke's automobiles by reason of their use in the business of local 88 during the years 1952 through 1956 sustained depreciation thereof of $300 a year for each *81 of those years. Such amounts are deductible for the respective taxable years from the total amounts of additional net income determined by respondent in the notice of deficiency here involved with respect to the instant issue. Opinion Gieseke died March 21, 1962, and prior thereto had not maintained a checking account. Subsequent to his death, Beatrice Gieseke, his widow, and administratrix of his estate and a petitioner herein, made a search for records maintained by him of his business activities but was unable to find any. As a consequence the record herein does not disclose that he made any expenditures during 1952 and 1953 for or on account of the business of local 88 from his Officers' Allowance received from the local during those years. At the trial herein lists of checks drawn by Gieseke on his Contingent Fund Account during the years 1953, 1954, 1955, and 1956 were introduced in evidence by stipulation of the parties as Exhibit Nos. 41, 42, 43, and 44, respectively. The lists contain columns captioned as follows: C
D
E
F
G
Auto Expense
Contributions, Tickets,
Food and
Gasoline
Other
Advertising, etc.
Beverage
Travel
Miscellaneous
*82 The amounts of the checks are distributed or entered in one or another of the various columns. The exhibits were prepared by or under the supervision of an accountant who based the classifications or distributions on classifications or distributions he had made of paid bills of Blassie for 1954 and 1955. The accountant had no personal knowledge as to whether the items and amounts listed in Exhibit Nos. 41 through 44 were for personal use or business use. The portion of the stipulation pursuant to which the above-mentioned exhibits were placed in evidence recites that Column C of the exhibits represents checks issued to Gieseke and to companies engaged in the automobile servicing business; that Columns D and G represent checks issued to the payees designated in the exhibits; that Column E of the exhibits represents checks issued to companies or other entities in the general business of selling foods and beverages, or in the hotel, bar, or restaurant business; and that Column F of the exhibits represents checks issued to railroads, out-of-town hotels, and airlines. The stipulation further recites that respondent does not agree that the checks were issued in payment for goods or services *83 furnished or rendered by the listed payees or if issued in payment for goods or services, that such payments constituted ordinary and necessary business expenses within the provisions of the Code of 1939 or the Code of 1954. The petitioners, apparently in reliance in part on Exhibit Nos. 41 through 44, contend on brief that the record herein establishes that Gieseke's activities and expenditures paralleled those of Blassie and that therefore we should make our findings as to Gieseke on the basis of the testimony and other evidence submitted by and on behalf of Blassie. While it is true that the salaries, Officers' Allowances, and the amounts of the Contingent Fund Accounts of Blassie and Gieseke for the years in issue paralleled each other, we are unable, on the record relating to Gieseke's activities, to conclude that a similar parallel existed as to their activities. As for the parallel between their expenditures, we are here concerned with their expenditures made on behalf of and for the business purposes of local 88. The record contains considerable testimony by Blassie and some testimony by others respecting such expenditures made by Blassie. On the other hand, the petitioners *84 have failed to point us to any evidence in the record and we have failed to find any which shows that the amounts set forth in the above-mentioned Exhibit Nos. 41 through 44 were expended by Gieseke on behalf of and for the business purposes of the local. As a consequence we are unable to conclude that during 1953 through 1956 Gieseke's expenditures on behalf of and for the business purposes of the local equaled or matched the expenditures of Blassie for such purposes during the same years. As in the Blassie case, the respondent has not here allowed the petitioners any deductions for depreciation with respect to the use of Gieseke's automobiles in the business of local 88 during the years 1952 through 1956. For like reasons set out in the Blassie case we have found under the rule of Cohan v. Commissioner, supra, and set out in our findings the amounts of depreciation sustained by Gieseke's automobiles by reason of such use in the business of the local and deductible by the petitioners. Issue 2 Respondent's Determination That Gieseke Realized Income From the Payment by Local 88 of Various Hotel, Restaurant, and Nightclub Charges Incurred by Him Opinion The respondent *85 increased the net income of the petitioners for the following years by the indicated amounts representing payments by the local to various hotels, restaurants, and nightclubs of charges incurred by Gieseke: Year
Amount
1952
$298.04
1953
937.58
1954
416.24
1955
393.17
1956
670,38
Since we are unable to find anything in the record directed to or bearing on this issue, the action of the respondent is sustained for lack of evidence to show error. Issue 3 Respondent's Determination That Petitioners Were Liable for the Addition to Tax Provided in Section 294(d)(1)(A), I.R.C. 1939, for 1952, 1953 and 1954 for Failure To File Timely Declarations of Estimated Income Tax for Those Years Findings of Fact Gieseke's salary reported in the income tax returns of petitioners was as follows for the indicated years: Year
Salary
1952
$13,000
1953
13,000
1954
13,250
In each of their income tax returns for 1952, 1953, and 1954 the petitioners reported and were allowed three exemptions. The respondent determined that petitioners did not file a timely declaration of estimated tax for the years 1952, 1953, and 1954 and accordingly determined an *86 addition to tax under section 294(d)(1)(A) of the 1939 Code for each of the years. Opinion Section 6015(i) of the 1954 Code provides that section 58 of the 1939 Code shall continue in force with respect to taxable years beginning before January 1, 1955. Section 6654(h) of the Code of 1954 provides that section 294(d) of the Code of 1939 shall continue in force with respect to taxable years beginning before January 1, 1955. In view of the foregoing, the provisions of sections 58 and 294(d) of the Code of 1939 are applicable to each of the taxable years 1952, 1953, and 1954 of the petitioners. As pointed out in the Blassie case, section 58 provided, in pertinent part, that every individual, with certain exceptions not material here, shall, at the time prescribed in subsection (d), make a declaration of his estimated tax for the taxable year if his gross income from wages can reasonably be expected to exceed the sum of $4,500 plus $600 with respect to each of his exemptions. Since Gieseke's salary for each of the years 1952 and 1953 was $13,000 and since the total of $4,500 plus $1,800, representing three exemptions, equals $6,300 and since Gieseke's salary for 1954 was $13,250 *87 and since $4,500 plus $1,800, representing three exemptions, equals $6,300, we think it is apparent that under the provisions of section 58 he was required to file a declaration of estimated income tax for each of the years 1952 through 1954. Section 294(d)(1)(A) imposes an addition to tax in the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is due to reasonable cause and not to willful neglect. Since the record does not show any facts as to the failure of the petitioners to file declarations of estimated tax for the years here involved and since the petitioners take the same position as did the petitioners in the Blassie case respecting their failure to file, what was said in the Blassie case is applicable here, and we accordingly sustain the respondent's determination that petitioners were liable for additions to tax for the years in issue. The amounts of such liability will be determined in a redetermination of the deficiencies in tax for 1952, 1953, and 1954 under Rule 50. Lorell P. Hicks Lorell P. Hicks and Catherine V. Hicks Issue 1 Respondent's Determination That Hicks Realized Income From the Receipt *88 From Local 88 of Various Allowances Findings of Fact During the year 1953 Hicks received from local 88 checks totaling $875 which were charged to "Officers' Allowances" on the books of the local. During the following years local 88 transferred to Hick's Contingent Fund Account by checks totaling the indicated amounts: Year
Amount
1953
$ 650
1954
975
1955
1,885
1956
3,380
During the following years Hicks received from local 88 checks totaling the indicated amounts which were charged on the books of the local to "Auto Mileage": Year
Amount
1953
$1,155.45
1954
1,228.20
1955
1,116.30
1956
1,190.90
During the following years Hicks received from local 88 checks totaling the indicated amounts which were charged on the books of the local to "Traveling, Convention and Conference Expenses": Year
Amount
1954
$ 50
1955
300
1956
900
During 1956 local 88 issued to Central Trades and Labor Union a check in the amount of $150 of which $30 was paid on behalf of Hicks. During the following years local 88, as payment of new automobile allowances to Hicks on new automobiles purchased by him in those years and titles *89 to which were taken in his name, issued to automobile dealers checks bearing the following dates and in the indicated amounts: Date of check
Amount
March 13, 1953
$501.75
March 23, 1954
766.00
February 9, 1955
861.35
January 23, 1956
790.00
The foregoing amounts represented one-fourth of the purchase price of the prior year's automobile. During the following years local 88 paid the amounts indicated as premiums on the insurance on the new automobiles purchased by Hicks and referred to in the preceding paragraph: Year
Amount
1953
$ 99.39
1954
195.78
1955
170.02
1956
168.50
The following statement summarizes the foregoing items comprising "Income from receipt of expense allowances" stated in the notice of deficiency for the years in issue: Description
1953
1954
1955
1956
Checks payable to Hicks -
$ 875.00
Officer's Allowances
Checks - Transferred to Hicks'
Contingent Fund Ac-
count
650.00
$ 975.00
$1,885.00
$3,380.00
Checks payable to Hicks - Auto
1,155.45
1,228.20
1,116.30
1,159.90
Mileage
Checks payable to Hicks - Travel,
Convention and Con-
ference Expenses
50.00
300.00
900.00
Checks paid to Third Party
30.00
Checks - New Automobile
501.75
766.00
861.35
790.00
Allowances
Premium Payments on Insurance on
99.39
195.78
170.02
168.50
New Automobiles
Total
$3,281.59
$3,214.98
$4,332.67
$6,428.40
*90 In determining the deficiencies in issue the respondent determined that the foregoing total amounts constituted income to the petitioners for the respective taxable years which they failed to report in their income tax returns for such years. In determining the deficiencies the respondent did not allow the petitioners any deductions with respect to the foregoing total amounts except for increasing the standard deductions of the petitioner for 1955 and 1956 which effected increased deductions of the petitioners by $82.85 for 1955 and $27.64 for 1956 over the amounts of nonbusiness deductions taken by petitioners for the respective years. Also the petitioners did not claim, nor did the respondent allow them, any deductions for depreciation with respect to Hicks' automobiles which he used in the business of local 88 and as to which automobiles he had received new automobile allowances from local 88. Hicks as business agent of local 88 during the years in issue worked under the supervision of Blassie and Gieseke. During those years Hicks lived in East Alton, Illinois, which is situated across the Mississippi River from St. Louis, Missouri, and is approximately 28 miles from the latter. *91 Hicks' territory consisted of an area in Illinois from Collinsville to Alton, parts of North St. Louis, some areas of outstate Missouri, and the poultry houses in the city of St. Louis. Hicks' duties as business agent of the local consisted of visiting the various grocery stores and butcher shops in his territory, interviewing butchers who were having problems with management, and going to the office of local 88 in connection with the settlement of such problems. On occasions, Hicks' duties required him to be with Blassie and Gieseke for organizational purposes, for picket line purposes, and for meetings. Hicks was required to use his automobiles in the performance of his duties. Normally each day he would go from his home in the morning directly on his rounds of visiting grocery stores and butcher shops in his territory where his services were required. In so doing, the distances he traveled to his first stop ranged from 2 miles to 100 miles or more. On those mornings when he was requested to come to the office of local 88 to pick up something, he went from his home to the office, got it, and proceeded to his duties elsewhere. As part of his duties as a business agent of local *92 88, Hicks held business meetings in both Illinois and Missouri with other locals and with employers. In connection with such meetings he made expenditures for food and beverages. In the use of his automobiles in the business of local 88 he also paid parking fees. In the fall of 1955 and again in the fall of 1956, Hicks, accompanied by Blassie and Gieseke, attended the Illinois State Convention of Labor which was composed of all the local unions in the State of Illinois which were affiliated with the American Federation of Labor. The convention in 1955 was held in Rock Island, Illinois, and the one in 1956 was held in Springfield, Illinois. The conventions lasted approximately 6 days in each of the years. The purpose of the conventions was to have business meetings and guest speakers and to adopt resolutions. Prior to his going to each of the conventions, local 88 issued to Hicks a check for $300 for payment of expenses to be incurred by him in attending the conventions. Of the amounts so advanced, $200 each year was expended by him on behalf of and for the business purposes of the local. In June 1956, the International Union of Amalgamated Meat Cutters held a convention in Cincinnati, *93 Ohio, which lasted approximately a week and which was attended by Blassie, Gieseke, and Hicks. Prior to his going to the convention, local 88 issued to Hicks a check for $600 for payment of expenses to be incurred by him in attending the convention. Of the amount so advanced, $498.72 was expended by Hicks on behalf of and for the business purposes of the local. Ultimate Findings of Fact Item 1 During the taxable years shown below Hicks paid on behalf of and for the business purposes of local 88 the following amounts with respect to the indicated items: Automobile
Food and
Parking
Year
expenses
beverages
and tips
Total
1953
$144.16
$ 78.13
$ 10.00
$ 232.29
1954
778.77
355.26
89.00
1,223.03
1955
599.75
683.47
235.00
1,518.22
1956
976.69
1,069.72
500.00
2,546.41
Item 2 Hicks' automobiles, by reason of their use in the business of local 88, during the years 1953 through 1956 sustained depreciation thereof of $300 for each of those years. Item 3 During the taxable years 1953 through 1956, Hicks made out-of-pocket unreimbursed payments for miscellaneous expenses incurred for and on behalf of the business of local 88 of *94 an amount of $100 a year. The amounts shown above in items 1, 2, and 3 are deductible for the respective taxable years from the total amounts of additional net income determined by the respondent in the notices of deficiencies here involved with respect to the instant issue. Opinion The positions of the parties and the primary question presented with respect to this issue are similar to the positions of the parties and the primary question presented in issue 1 in the Blassie case. Here, as there, from our consideration as a whole of the record relating to the instant issue in connection with the arguments and contentions of the parties and with the use of the rule in Cohan v. Commissioner, supra, where applicable, we have found the amounts set out in our findings herein to be deductible from the additional income of petitioners as determined by respondent in the instant issue. In determining the foregoing amounts we have not included any amount shown as a political contribution since we have not found anything in the record to indicate that the arrangement under which Hicks' Officer's Allowances and his Contingent Fund Account were made, required or contemplated *95 that such allowance and fund were to be used for making contributions of that character on behalf of and for the business purposes of local 88. In connection with the foregoing we have considered the respondent's nonallowance to petitioners of deductions for depreciation for the years in issue with respect to Hicks' automobiles which he used in the business of local 88 and also the petitioners' position with respect thereto, which position is similar to that taken by the petitioners in the Blassie case. Since the evidentiary situation here is like that in the Blassie case, our holding in that case is applicable. Accordingly, here, as there, we have applied the rule in Cohan v. Commissioner and determined the depreciation allowances with respect to Hicks' automobiles as set out in our findings as to the instant issue. Issue 2 Respondent's Determination That Petitioner Hicks Was Liable for the Addition to Tax Provided in Section 294(d)(1)(A), I.R.C. 1939, for 1953 and 1954 for Failure To File Timely Declarations of Estimated Income Tax for Those Years Findings of Fact In his income tax returns for 1953 and 1954 Hicks reported salaries from local 88 in the amounts of $5,200 and *96 $5,755, respectively, and salaries from the village of East Alton, Illinois, of $165 and $160, respectively. In his return for 1953 he reported and was allowed five exemptions and in his return for 1954 he reported and was allowed six exemptions. In our findings in issue 1, supra, there are set out the various allowances and amounts thereof made by the local to Hicks during 1953 and 1954, respectively. Opinion As pointed out in the Blassie case, section 58 of the 1939 Code, which by section 6015(i) of the Code of 1954 was continued in effect for the years beginning prior to January 1, 1955, required that a declaration of estimated tax be filed by every individual if (1) his gross income from wages can reasonably be expected to exceed the sum of $4,500 plus $600 with respect to each of his exemptions, or (2) his gross income from sources other than wages can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more. Hicks' situation with respect to salaries and exemptions during 1953 and 1954 was such that he was not required under the first of the foregoing provisions of section 58 to file declarations of estimated tax for those years. *97 However, the record shows that on March 13, 1953, and on March 23, 1954, Hicks received from local 88 new automobile allowances in the amounts of $501.75 and $766.00, each of which is in excess of $100 of gross income from sources other than wages. In view of the foregoing and since Hicks' gross income for each of the years was in excess of $600, we conclude that under the above-stated second requirement of section 58 he was required to file a declaration of estimated tax for each of the years. Section 294(d)(1)(A) of the Code of 1939 imposes an addition to tax in case of failure to make and file a declaration of estimated tax within the time prescribed unless such failure is due to reasonable cause and not to willful neglect. Section 6554(h) of the Code of 1954 continued in force section 294(d) of the Code of 1939 with respect to taxable years beginning before January 1, 1955. Consequently section 294(d)(1)(A) is applicable to both of petitioners' taxable years 1953 and 1954. The record does not show any facts as to the failure of Hicks to file declarations of estimated tax for the years 1953 and 1954 and his statement of position is similar to that discussed in the Blassie case. *98 The discussion and holding in that case is applicable here and we accordingly sustain the respondent's action in determining that Hicks was liable for additions to tax under section 294(d)(1)(A) for the years in issue. The amounts of such liability will be determined in a redetermination of the deficiencies in tax for 1953 and 1954 under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Estate of August Gieseke, Deceased, Beatrice Gieseke, Administratrix, and Beatrice Gieseke, docket No. 5535-63; Lorell P. Hicks, docket No. 5536-63; and Lorell P. Hicks and Catherine V. Hicks, docket No. 5537-63.↩
2. SEC. 58. DECLARATION OF ESTIMATED TAX BY INDIVIDUALS. (a) Requirement of Declaration. - Every individual (other than an estate or trust and other than a nonresident alien with respect to whose wages, as defined in section 1621(a), withholding under Subchapter D of Chapter 9 is not made applicable, but including every alien individual who is a resident of Puerto Rico during the entire taxable year) shall, at the time prescribed in subsection (d), make a declaration of his estimated tax for the taxable year if - (1) his gross income from wages (as defined in section 1621) can reasonably be expected to exceed the sum of $4,500 plus $600 with respect to each exemption provided in section 25(b); or (2) his gross income from sources other than wages (as defined in section 1621) can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more. (b) Contents of Declaration. - In the declaration required under subsection (a) the individual shall state - (1) the amount which he estimates as the amount of tax under this chapter for the taxable year, without regard to any credits under sections 32 and 35 for taxes withheld at source and without regard to the tax imposed by subchapter E on self-employment income; (2) the amount which he estimates as the credits for the taxable year under sections 32 and 35; and (3) the excess of the amount estimated under paragraph (1) over the amount estimated under paragraph (2), which excess for the purposes of this chapter shall be considered the estimated tax for the taxable year.↩
3. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. (d) Estimated Tax. - (1) Failure to File Declaration or Pay Installment of Estimated Tax. - (A) Failure to File Declaration. - In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 percentum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 percentum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *↩
4. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. (d) Estimated Tax. - * * *
(2) Substantial Underestimate of Estimated Tax. - If 80 percentum of the tax (determined without regard to the credits under sections 32 and 35) in the case of individuals * * * exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 percentum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes timely payment of estimated tax within or before each quarter (excluding, in case the taxable year begins in 1943, any quarter beginning prior to July 1, 1943) of such year * * * in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year (* * * or in case the fifteenth day of the third month of the taxable year occurs after July 1, on July 1 of the taxable year) but otherwise on the basis of the facts shown on his return for the preceding taxable year. * * *↩